CLEAR TELEVISION CABLE CORPORATION, APPELLANT AND CROSS-RESPONDENT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, RESPONDENT AND CROSS-APPELLANT, AND NATIONAL VIDEO SYSTEMS, INC., INTERVENOR.

NATIONAL VIDEO SYSTEMS, INC., APPELLANT AND CROSS-RESPONDENT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, RESPONDENT AND CROSS-APPELLANT, AND CLEAR TELEVISION CABLE CORPORATION, INTERVENOR.

Argued October 9, 1979—Decided January 26, 1981.

*Roger A. Lowenstein* argued the cause for appellant Clear Television Cable Corporation (*Lowenstein, Sandler, Brochin, Kohn & Fisher,* attorneys; *John C. Kennedy* on the brief).

*Francis R. Perkins* argued the cause for appellant National Video Systems, Inc. (*Holzapfel & Perkins,* attorneys).

*Erminie L. Conley,* Assistant Attorney General, argued the cause for cross-appellant Board of Public Utility Commissioners (*John J. Degnan,* Attorney General of New Jersey, attorney; *Nielsen V. Lewis,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

WILENTZ, C. J.

This case involves a conflict between state and local power in the franchising of cable television companies. It concerns the extent to which regional considerations as perceived by the Board of Public Utilities Commissioners may prevail over local considerations as perceived by the affected municipalities. In particular we are concerned here with the power of the Board to impose a certain cable television service provided by one compa-. ny upon two non-consenting municipalities which preferred another service from a different company. The Board decision was based on various regional considerations, including its con-

clusion that the decision was necessary to assure continued low-cost cable television service to three other neighboring municipalities.

Given the complexity of the matter, we have preceded our detailed discussion of the factual and procedural setting with a general description of the facts and the Cable Television Act, *N.J.S.A.* 48:5A–1 *et seq.* (the Act) (I), followed by the relevant history of the CATV industry and the Act (II). With this background, the factual and procedural details of the case (including a discussion of the Appellate Division decision) are set forth (III), leading to an analysis of the critical portions of the Act (sections 17(b), (c) and (d)) (IV) and the action of the Board (V). We conclude with a summary of our holding (VI).

## I.

### GENERAL DESCRIPTION: THE ACT AND THE FACTS

The Act, discussed in more detail below, provides a framework for the issuance of CATV franchises and the regulation of cable television service. The power over cable television, both in franchising and regulation, is divided between the Board and the municipalities. The Board sets certain minimum technical requirements for all cable companies in the State. The municipality then selects a cable television company and the type of service that conform at least to the minimum requirements. The Board has the ultimate power to grant or deny the right to operate where a municipality has given a company consent thereto. The Board's power to override municipal action, whether it be a denial or a consent, is greatest when regional considerations affecting the cable television needs of an area beyond the municipality are threatened by the municipal decision.

The statutory plan is effected by requiring companies to obtain from the Board a certificate of approval in order to

operate, *N.J.S.A.* 48:5A–15.[1]  A precondition for the certificate is possession of a consent from the municipality where the company will be operating (section 22).[2]  A municipality may, after holding public hearings on the applications for consent (section 23(b)), choose a company or companies that will provide the service which it desires.  The municipality is expected to ground its decision on "all requirements" of the Act (section 25), "and of [the] rules, regulations and orders duly promulgated by the director," but to ensure compliance with the Act's terms, a further review by the Board is required.  This review, which may require a hearing under certain circumstances, addresses "public convenience and necessity" (section 16(b)) in addition to the matters examined by the municipality, such as the applicant's ability, including financial, to provide the service it proposes and the rates it intends to charge its customers, section 16. Here, the Board has the authority to deny certification to an applicant, even where a municipality has granted consent, if the applicant does not meet the standards set out in section 16.[3]  In

---

[1]The provisions of the Act will be referred to by section number only. Section 15 states:

> No person shall hereafter begin the construction, extension or operation of a CATV system or acquire ownership or control thereof without first obtaining from the board a certificate of approval issued in accordance with the provisions and procedures specified in this act;  except that the director may, by order, rule or regulation, exempt a CATV company from the above certificate requirement in a case where its temporary acts or operations do not require the issuance of a certificate in the public interest.

[2]Section 22 states:

> In any case where a CATV company operates or proposes to operate in a municipality or municipalities where facilities are to be placed in, along, beneath or over highways and other public places, no certificate of approval for such operation shall be issued without a municipal consent being first granted therefor by resolution of the municipal governing body.

[3]In section 16 review, where the applicant comes before the Board with consent from the municipality, the Board may grant or deny certification based on its own independent conclusions as to whether the applicant meets

addition, the Board has the task, not explicitly delegated to the municipality, of examining the application in its regional, as well as merely local, context, section 17(b).

Generally, therefore, although it has broad discretion to grant or deny operating certificates, the Board does not dictate to the municipalities what company or type of service they may choose. The purpose of this two-tiered approach is

to protect the interests of the several municipalities of this State in relation to the issuance of municipal consents for the operation of cable television companies within their several jurisdictions, and to secure a desirable degree of uniformity in the practices and operations of cable television companies in those several jurisdictions .... [section 2(c)].

In the case before us, Clear Television Cable Corporation (Clear) held municipal consents for two entire townships (Dover and Berkeley Townships in Ocean County). It was operating on the mainland area of both pursuant to Board certification, but had not obtained certification for the beach areas which are physically separated from the mainland by Barnegat Bay. The subject of this case is Clear's application for these beach certificates, which were also sought by National Video Systems (National). National had been denied consent by the municipalities to operate in the townships, although it presently serves neighboring townships which are contiguous to the beach areas contested by the two companies. National intervened in Clear's beach application proceeding before the Board. The Board heard the two contestants for the beach area and regarded the issue as being whether the cable television needs of the region would be better served by a grant to Clear or to National. It determined that it was empowered to "make its own indepen-

---

the requirements of the Act. The decision of the municipality, while entitled to some deference by the Board, is not at all conclusive although the Board may not reverse the municipal consent without a hearing. Section 16(b). In contrast, where an applicant comes before the Board *without* a municipal consent, requesting certification to operate pursuant to section 17(d), the Board may, in effect, reverse the municipality's denial only on a showing that it acted arbitrarily. *See infra* beginning at 32.

dent analysis of 'regionalization' factors to determine whether a municipal consent may impede adequate service," *Hearing Examiner's Report & Recommendations, I/M/O Application of Clear Television Cable Corp.*, Docket Nos. 735C–5007 & 746C–6028, 11/30/76, at 21 (Finding 2). On balance it concluded that the cable needs of the region would be better served by a grant to National. The question before us is whether the Board has the authority to make this grant.

## II.

### THE LEGISLATION AND THE CATV INDUSTRY

The Act balances the interest of municipalities in obtaining cable service that meets their own needs against the interest of the State and the public in assuring that the statewide cable system operates effectively. The recognition of the dual nature of cable service—as a regional "network" and also as a consumer service historically subject to local control—is embodied in section 17 of the Act. The goal of the statute is to

assure that local considerations—and perhaps local inadequacies—in any one municipality should not be allowed to affect other municipalities adversely or to inflict upon subscribers a service of lower quality than might reasonably be expected. [State of New Jersey CATV Study Comm'n, *Report to the Governor and Legislature* (pursuant to Assembly Concurr. Resolu. No. 2041 of 1971), 1972, p. 42].

Cable television's dual local/regional nature is based on the purposes and technology of the industry itself. Cable television operates through the transmission of television signals over special cables that run along ordinary utility and public rights of way. Essential to its operation are two types of equipment: the antenna and the cable. Towering antennae are constructed in high places to pick up the broadcast signal, sometimes in locations that are outside the municipality to be served. Cables are strung from the antenna to the customers' homes, at times across one municipality having one service to another having a different service. In this regard, the cable television industry requires intermunicipality cooperation. One of the features that

sets cable television apart from ordinary broadcast television is its unique ability to carry a multiplicity of signals, thereby providing access to the air to many small groups of local origin and interest as well as to national broadcasts.

The cable industry developed initially in New Jersey and elsewhere as a local service subject only to municipal permission to operate on public rights-of-way. Center for Analysis of Public Issues, *Crossed Wires: Cable Television in New Jersey*, Princeton 1971, pp. 5–7, 9.

Before the enactment of the New Jersey Cable Television Act in 1972, the FCC and local municipalities were the only source of regulation of the industry in this State. FCC regulation was confined to promulgating certain technical and safety standards, integrating the cable system into the over-the-air system, and encouraging cable operators to develop local and community service programming. State of New Jersey CATV Study Comm'n, *Report to the Governor and Legislature* (Pursuant to Assembly Concurr. Resolu. No. 2041 of 1971) 1972, p. 11. Municipalities were primarily concerned with cable's use of public rights of way, and would grant cable television franchises in return for annual fees or taxes and sometimes promises from the companies to provide community access to one or two channels. *Ibid.* at 9. As part of this municipal regulation, there were problems with cable companies "sitting on" their municipal franchises while a locality remained unserved until the area grew to a threshold population. There were also allegations of municipal corruption in the granting of franchises. *See, e. g.,* CATV Study Comm'n, *Report, supra,* at 35–36; *Crossed Wires, supra,* at 22–24. As a result of the lack of centralized planning, cable development in New Jersey by the early 1970s had resulted in a patchwork of service across the State, with some populous communities receiving double cable service and certain rural areas, where cable service was not economically feasible, receiving no service whatsoever. CATV Study Comm'n, *Report, supra,* at 31–32, 35–36. In response to the problems arising from a lack of central organization assuring sensible regional

development, the Legislature, while recognizing the desire for continued local control, enacted various corrective provisions, including the "regionalization" section of the Act. These provisions were based on the Study Commission's Report that recommended

> a comprehensive system of State regulation and supervision, capable of adjusting local conflicts and overriding local considerations wherever the same may tend to vitiate efforts to secure adequate CATV service to *all* municipalities of the State .... [State of New Jersey CATV Study Comm'n, *Report to the Governor and Legislature* (Pursuant to Assembly Concurr. Resolu. No. 2041 of 1971) 1972 at 41–42].

The section of the Act that sets forth the "regionalization" power of the Board is 17(b):

> In considering any such application, the board shall take into consideration the probable effects upon both the area for which certification is sought and neighboring areas not covered in the municipal consents; and if it finds that the probable effects, for technical and financial reasons, would be to impede the development of adequate cable television service, or create an unreasonable duplication of services likely to be detrimental to the development of adequate cable television service in any area either within or without the area for which certification is sought, it may deny the certificate or it may amend the certificate so as to
>
> (1) direct that areas covered in the application be excluded from the area certified, or
>
> (2) direct that areas not covered in the application be included in the area certified.

Section 17(b)(2) authorizes the Board to require a company to provide service to an area greater than that covered by the consent when necessary to promote efficient cable television development, whether that area is within or without the municipality, if the company has already obtained a municipal consent and is requesting Board certification for an area.[4] This power to regionalize under section 17(b) is limited by section 17(c) (if the enlarged area is already subject to a certificate) and, in this

---

[4]Section 17(c) implies that the Board may extend the scope of the permit outside municipal boundaries by requiring the participation of all affected municipalities. It provides in part: "No such certificate amended pursuant to subsection b. of this section shall be issued except after hearing of which each affected municipality shall be given notice and afforded opportunity to be heard."

case, its exercise is complicated by section 17(d) [5] which restricts the Board's certification power to reverse a municipal denial of consent to instances where the denial is "arbitrary." The meaning and interplay of these sections are treated in detail in part IV.

## III.

### FACTS AND PROCEDURAL HISTORY

Dover and Berkeley both consist of mainland areas and beach areas. The controversy in this case centers on their beach areas which are located on Island Beach Peninsula. The Peninsula lies parallel to the mainland and is separated from it by Barnegat Bay. The Dover and Berkeley beach strips are thus separated by water from the mainland part of the municipalities. The beach strips themselves are not contiguous; rather they are bordered by the beach municipalities of Lavallette, Seaside Heights and Seaside Park, which receive cable television service from National.[6]

Until these proceedings the beach strips of Dover and Berkeley had not received cable service at all. The mainland of Berkeley Township was serviced by Clear, which received a municipal franchise covering all of Berkeley Township in 1970, before promulgation of the Act. Clear had not, however, developed the beach area. In November 1973, following passage of the Act, Clear received certification from the Board pursuant to

---

[5]Section 17(d) states:

> If a municipality shall arbitrarily refuse to grant the municipal consent required under the terms of this act prerequisite to issuance of a certificate, or to act upon an application for such municipal consent within 90 days after such application is filed, then the applicant CATV company may avoid the necessity of first obtaining such municipal consent by showing to the satisfaction of the board that the municipal consent is being arbitrarily withheld.

[6]National's certification to operate in Lavallette, Seaside Heights and Seaside Park was issued under the "grandfather clause" in section 17(f).

the "grandfather clause" for the mainland areas of Berkeley, where it was already operating, but not for the unserved part of the mainland or the beach area.

The mainland of Dover Township has been serviced by Clear pursuant to municipal consent to operate in the entire municipality, granted under the Act in 1974, followed by Board certification limited to the mainland. The Dover consent was granted following public hearings in which both Clear and National took part pursuant to section 23.[7] The Berkeley franchise was also granted following public hearings, in April 1970, before the Act; National did not take part in these hearings, although three other cable television companies did.

---

[7]Section 23 provides in part:

a. Application for a municipal consent required under section 22 of this act shall be made by a CATV company by filing thereof, on forms prescribed by the director, with the clerk of the municipality, with a duplicate thereof to be filed with the office. The application filed with the clerk of the municipality shall be accompanied by a filing fee of $100.00.

b. Upon receipt of such application, the municipal governing body shall schedule a hearing thereon, to be held not sooner than 60 nor later than 90 days after the filing of such application. Said hearing may be adjourned from time to time, but not to any date later than 30 days from the date upon which it was first convened.

c. Notice of the receipt of such application, and of the hearing scheduled thereon, shall be published in at least one newspaper of general circulation in the municipality not later than the forty-fifth day prior to such hearing, and again not sooner than the fourteenth day nor later than the seventh day prior to such hearing. Additional applications may be received by the municipality until the fifteenth day prior to the hearing. Said notices shall specify:

(1) the identity of the applicant or applicants;

(2) the time and place of the hearing;

(3) the place at which and time within which applications filed with the municipal clerk may be examined by residents of the municipality and other interested parties.

d. The municipal governing body shall within 30 days after the conclusion of the hearing make a decision regarding the application or applications before it, and shall issue a written report of such decision, detailing the reasons therefor, one copy of which shall be filed with the municipal clerk and another copy with the office, which shall be a public record.

At different times in early 1974, when it was apparent that Clear, supported by Berkeley and Dover, would attempt to obtain Board certification for the beach strips, National presented both townships with new proposals solely for beach area consents. The Township Clerk of Berkeley accepted National's application, but then returned it. Dover never published notice of receipt of the application or scheduled a hearing on it pursuant to section 23 of the Act. Both municipalities support their actions by the fact that they had already granted Clear their cable consents, Berkeley in 1970, Dover in 1974, and did not want to divide their townships between two cable companies. Dover also argues that it had only recently considered and rejected an application by National in connection with the hearings that led to granting consent to Clear.

In April 1974, within 90 days from rejection of its applications as required by section 17(d), National petitioned the Board for certification to operate on the beach areas. It claimed that its proposals to Dover and Berkeley had been arbitrarily denied and that therefore the Board should issue a certificate without municipal consent, as permitted by that section. During this period, Clear's applications on its Dover and Berkeley municipal consents, including the beach areas, were being processed by the Board. National objected to Clear's applications and requested the Board to limit the certification of Clear to the mainland areas of the municipalities (for which National was not applying) pending resolution of National's claim of arbitrary refusal concerning the beach areas. The Board granted this request, certifying Clear for Dover's and Berkeley's mainland areas only. National, however, lost its contest on the section 17(d) issue, for the Board ruled that the denials by Berkeley and Dover of National's application were not "arbitrary." National appealed this decision to the Appellate Division.

National then requested that the Board hold hearings on Clear's remaining application for certification of the beach area in order that the "regionalization" issue of section 17(b) might be examined. The Board granted the request and at these

hearings National contested Clear's application by presenting its own beach area proposal that was somewhat different from the ones it had presented to the municipalities. National argued that its cable television operation on the beach strip in the areas of Lavallette, Seaside Heights and Seaside Park made it a more economical and feasible choice than Clear to provide service to the adjacent beach areas of Dover and Berkeley. Hearings were held in August and September 1976, and in February 1977 the Board, adopting the findings of the Hearing Examiner, denied Clear's application and instead granted the beach certificates to National.

National's appeal of the Board's contrary decision concerning section 17(d), finding that the municipalities had not acted arbitrarily in denying its applications for beach consent, was pending in the Appellate Division when the Board rendered the second decision, rejecting Clear's application in favor of National. Clear appealed the latter decision to the Appellate Division. The appeals were heard together and the Appellate Division reversed the Board. It determined that the municipalities had arbitrarily denied National consent by refusing to act upon the proposals submitted; however, in remanding the matter for reconsideration, the Appellate Division directed the Board to examine only the beach area proposals National had submitted to the municipalities, not the new ones thereafter submitted at the Board hearings. It also reversed the Board's decision to grant the beach areas to National rather than to Clear on the ground that National did not technically have an application supported by the required municipal consents, and, additionally, that section 17(c) prohibits such a grant (under section 17(b)) by denying to the Board the authority to "impair" existing municipal consents possessed by Clear.

The effect of the Appellate Division's decision was essentially to have the Board referee yet another round in the bout between Clear and National for the Dover and Berkeley beach areas, and thereby to prolong a contest that had already lasted four years. In these new proceedings, National's status would

be officially promoted to "applicant" (due to the holding that its applications were arbitrarily denied by the municipalities), but National would be handicapped by being restricted to the applications the municipalities had rejected. The Board was then to choose which company to certify after entirely new hearings and findings. We granted certification on petitions from both companies to resolve the issues and to clarify certain troublesome sections of the Act.

We believe the Appellate Division misapplied section 17 of the Act. In its construction of the Act, it did not sufficiently give effect to the Legislature's intent to assure provision of cable television service on a regional basis.

The complexity of the statutory scheme was magnified in the instant case by the confusion resulting from the concurrent section 17(d) and 17(b) proceedings and the Appellate Division's attempt to reconcile the Board's decision against National on 17(d) grounds with its decision in favor of National on 17(b) grounds. The Appellate Division's reversal was similarly inconsistent—favoring National on the 17(d) issue but against it on 17(b).

The Appellate Division's rationale for overruling the Board's grant of certification on regionalization grounds (section 17(b)) to National was that

> the only application the Board could consider was that of Clear. No application by National was then pending before the Board. Indeed, it could not have submitted a section 17(a) application since it lacked the necessary municipal consents and the Board had already determined at the section 17(d) hearing that the consents had not been arbitrarily refused. [*Clear Television Cable Corp. v. Board of Public Utility Comm'rs*, 162 *N.J.Super.* 84, 91 (App.Div.1978)].

The "section 17(a) application" referred to in the Appellate Division decision is the ordinary application for a certificate made by a company that has received municipal consent.

Review of the decision of the Appellate Division requires further analysis of the critical subsections of the Act, namely sections 17(b), (c), and (d).

## IV.

### SECTION 17

A. *"Regionalization"—Section 17(b)*

As noted above (*supra* at 40), section 17(b)(2) authorizes the Board to require a company to provide service to an area greater than that covered by its municipal consent on regional grounds. As the Appellate Division correctly noted, the language of that provision (17(b)) limits its applicability to a company that has received municipal consent under the Act and is applying for Board certification. The Board, if persuaded by regional factors, can then either restrict the certificate to an area less than that applied for, or "direct" that the area be enlarged. It is this latter power—to enlarge the area—that leads to the conclusion that, for regional purposes, the Board may expand the certification beyond the border of the consenting municipality into areas within a municipality that has not granted consent.

Section 17(b) is the only section of the Act that allows the Board to consider regional factors. Given the strong legislative intent to empower the Board to franchise cable TV on a regional basis, the scope of this section, if literally read, is remarkably narrow.[8]

---

[8] Its very limited impact can be understood by assuming contiguous municipalities "X" and "Y" which could best be served, for regional reasons, by company "A." If "A" receives consent from "X" and then applies to the Board for certification covering "X," the Board, under 17(b), can grant the certificate not only for "X," but for both "X" and "Y." But if company "A" already *has* its certificate in "X" and is operating there, the Board has no power under 17(b) to expand that certificate to cover "Y": literally read, that section covers only an applicant who has received municipal consent and is applying for—but does not yet have—a certificate. It would be absurd to construe this section so literally—what conceivable reason is there for allowing the Board to "regionalize" a non-operating company but not an operating one? Similarly, and even more clearly, section 17(b) would not allow the Board to issue a certificate to company "A" for "Y" municipality if "A"'s only status was that it was operating in "X" under a "grandfather" certificate pursuant to section 17(f). In that case, not only would it be barred as in the

■ If we are to give effect to regional factors as intended by the Legislature, 17(b) must be broadly construed. Therefore, we hold that the Board must have the power under that section, regardless of the lack of municipal consent, to issue a certificate covering a municipality to a company already operating in a neighboring municipality (whether under 17(a) or 17(f)) and to do so either (i) upon appeal from that municipality's denial of consent (without the restriction of the "arbitrary" standard of section 17(d)), (ii) upon that company's participation as a competitor/objector under section 16(b) to the issuance of the certificate to another company, or (iii) upon direct application to the Board for such regional certification. In all such cases, the procedural protection of 17(b) will be afforded, including notice to the affected municipalities and to competing companies and a hearing on the issues. The restrictions of section 17(c), discussed later, concerning the impairment of outstanding certificates, will also be applied.

National, operating in neighboring municipalities pursuant to Board 17(f) certification, was qualified for section 17(b) Board certification in Dover and Berkeley under any one of the three procedures approved above. First, it had appealed both municipalities' denial of consent (although mistakenly calling them 17(d) appeals rather than 17(b)); second, it participated as a competitor/objector to Clear's beach applications before the Board; and third, although perhaps not as certain, it can be

---

first example (since it already possessed a certificate) but additionally would not qualify since the application referred to in 17(b) ("such application") is one under 17(a), not 17(f). This construction is equally lacking in good sense. Indeed, 17(b), literally read, prevents a company *with* a consent for "X" from *applying* for a certificate for "X" and "Y." The application may be for "X" only; the Board may then "direct" the seemingly unwilling company to serve "Y" as well.

regarded as having made direct application to the Board for such certification.[9]

Our construction of this regional power will enable the Board to promote a sensible regional system despite lack of municipal consent. As the legislative history and 17(b) demonstrate, the Legislature recognized that municipalities' selection of companies might not meet regional needs. A municipality may contain two distinct sections, each of which extends into other municipalities. The best regional cable TV service might be provided by having a different company serve each section, yet for administrative or other reasons, the municipality might want just one company for its entire territory. In other cases, one company might propose the lowest rates to the municipality; however, another company serving neighboring municipalities, which had counted on also serving that municipality, might be forced to raise its rates in these neighboring municipalities to make up for the loss of this anticipated revenue. Many other examples undoubtedly exist where municipal consent will not be forthcoming despite the regional advantages involved.

Allowing the Board to consider only those applications to which the municipality had consented would subject the authority of the Board to effect a regional plan to the unilateral decisions of each locality—perhaps the only locality in the area not served by a particular company. The Board might be powerless to examine the application of a company that is actually the best regional choice, but which does not have an application pending backed by a municipal consent. The Legislature cannot have intended to hamstring the Board in this way.

■ Our holding here is not intended to relieve cable television companies from the requirement set forth in section 22 of

---

[9]We need not here decide whether a company, having neither a consent nor Board certification from any municipality in the area, is entitled to section 17(b) consideration. National had both consent and certification from neighboring municipalities.

the Act that they attempt to obtain a municipal consent before approaching the Board for certification, except in very limited cases. *Cf. Garden State Farms, Inc. v. Mayor Louis Bay, II*, 77 *N.J.* 439, 454–56 (1978). Only where a cable company shows that such an attempt would be futile (for example, because its advantages accrue only to the region and not the municipality), should the municipality lose the opportunity of hearing the evidence for itself. This lack of initial municipal participation in these limited situations does no violence to the Act. Even in its clearly intended application, namely where a company with consent in municipality "X" receives a certificate under 17(b) for both "X" and "Y," the non-consenting municipality is not afforded the opportunity of a municipal hearing on the application—at least the Act does not require one (nor do we intend, by this opinion, to require one in such case). The interests of the non-consenting municipality are protected there, as in the procedures approved in this opinion, by participation in the Board hearing.

In the ordinary case, the 17(b) application which does not fit literally within 17(b) [10] will be made first to the municipality. If the applicant's claim is based significantly on regional factors, it should state this explicitly to the municipality, so that the municipality may consider this issue in addition to the usual ones involved in granting a franchise. Municipal consideration of the issue may in some cases provide the Board with additional insight into the effects that a grant or denial of certification would have upon the region. However, the Board need not give the same degree of consideration to the municipality's regionalization determination—if the municipality makes any—that it

---

[10]As noted above, 17(b), literally read, does not contemplate any municipal application to the non-consenting municipality which becomes subject to a Board certificate under 17(b)(2). The municipal application is made to the neighboring municipality whose consent provides the basis for certification for both municipalities. It is our intention that Board applications resulting in 17(b) certification other than the type mentioned in this footnote will ordinarily be preceded by municipal application.

would to matters of local concern (such as types of service or location of facilities) where the application has no regional impact. The specific directive in the Act requiring only the Board to consider regionalization issues indicates recognition by the Legislature that a municipality is not the most competent entity to consider factors affecting areas beyond its own borders. If a municipality has determined that for local reasons it will not grant a particular applicant consent, it is most unlikely that concern for its neighbor would impel it to overcome what it conceives to be its own self-interest and grant the consent.

◼ As noted above, the applicant should ordinarily raise the regionalization issue at the municipal level. If the regional issue is not addressed below the Board may, if it sees fit, refer the matter back to the municipality for further consideration. The Board, in so deciding, should balance the desirability of further findings against the need to expedite the proceedings. Should the Board decide not to send the matter back, the municipality will in any case have the opportunity to present its view at the regionalization hearing required by section 17(c). In this way, the municipality will not be saddled with a decision in which it took no part, and the Board will have the information it deems necessary, when it deems necessary.

B. *Limitation on Board's Regional Power—Section 17(c)*

◼ The power of the Board to grant certificates based upon regional needs is limited by section 17(c) [11] which prohibits the Board from issuing a certificate based on regional needs if that certificate would impair "any existing certificate or ... any municipal consent upon which such existing certificate is based."

---

[11]Section 17(c) states, in part:

No such amended certificate shall be issued which would impair the terms of any existing certificate or of any municipal consent upon which such existing certificate is based, except with the consent of the holder of such existing certificate and of any municipality having issued such municipal consent.

The Appellate Division held that since Clear already had municipal consent for the beach area, the Board was powerless to grant certification to National under section 17(b).  It concluded such action would "impair" Clear's municipal consents and was therefore prohibited by section 17(c).  For purposes of the case before us, we need not decide what the Legislature meant by "impair," for we read section 17(c) as limiting the Board's power to grant certificates on a regional basis only where the area in question is already subject to a previously issued *certificate*, rather than merely a *municipal consent.*  While we recognize the logic of the Appellate Division's contrary reading, such reading would effectively frustrate the legislative intent to empower the Board to promote sensible regional policies.  We note that the statutory language is "municipal consent *upon which* [an] *existing certificate is based.*"  To prohibit the Board from issuing a certificate to a company for an area which is covered in the municipal consent of another company, but not covered by a Board-issued certificate, would give a veto to municipalities over the Board's power to effectuate regional decisions.  It is only where there is a prior Board-issued certificate that a regional decision by the Board, assuming it has the effect of "impairing" such certificate, is conditioned upon the consent of the holder of the certificate and the municipality whose consent was the basis for the certificate.  In such case, the cable company will have gone beyond the preliminary stage of applying for permission to operate.  With possession of a certificate to operate—as opposed to a municipal consent, which is merely the first step in the application procedure—the Legislature apparently believed that the cable company should be entitled to rely on the Board's decision and commence operations on the terms and conditions under which it was certified.[12]

---

[12]While the Act contemplates competing franchises in one area (*see, e. g.,* section 23), we anticipate that ordinarily the municipality will give consent only to one company for a particular area.

The Board, therefore, was not prohibited by section 17(c) from granting certification to National by virtue of the outstanding Clear municipal consents.[13]

## C. *The Board's Power to Reverse Arbitrary Municipal Denials—Section 17(d)*

Section 17(d) of the Act suggests another approach in dealing with applications rejected by municipalities. Under that section any company denied a municipal consent may appeal to the Board, which has the power to grant a certificate despite the lack of consent, where such denial is found by the Board to have been "arbitrary." As we have indicated above, however, the power of the Board to effect sensible *regional* decisions was not intended to be dependent upon a showing that the municipalities involved had acted arbitrarily. The "arbitrary" standard applicable to municipal denials subject to Board review relates only to determinations of local concern. This limitation on Board review is designed to assure that the balance of interests between municipality and state is not tilted too heavily toward the latter.[14] When the Board acts concerning a regional issue,

---

[13]Despite its holding that a grant by the Board of a certificate to National under 17(b) would violate section 17(c), the Appellate Division remanded the matter to the Board for further proceedings which contemplated the possibility of an ultimate grant to National. Presumably the Appellate Division concluded the 17(c) limitations applied only to certification granted under 17(b) and not under 17(d). We express no opinion on that issue, except to note that the conclusion implies greater Board power to effect the purposes of the Act despite a preexisting consent where local interests are involved (17(d)) than where regional interests are involved (17(b)).

[14]As the CATV Study Commission recommended,

the general regulatory scheme for CATV should allow for much greater regulation on the municipal level than is provided with respect to public utilities—particularly in the matter of rates and the provision of certain community services. Local communities would remain free to a great extent to bargain and agree with CATV systems operators as to those things within their respective franchise areas subject only to a general review by the Office of Cable Television under certain minimum guidelines laid down. [CATV Study Comm'n, *Report, supra*, at 56–57].

however, it is not reviewing the decision of any municipality in terms of whether that decision was rationally or arbitrarily made. The decision there is ultimately not the municipality's, but the Board's, and is not controlled by the outcome below.

In this case, National's real claim was a regional one under section 17(b). Its claims under 17(d) were procedurally confusing. In the future, applicants should make it clear when the real basis for their appeal is a section 17(b) regionalization claim. They will be given the right, along with the affected municipalities, to participate in further proceedings before the Board as we have explained above.

### D. Summary of Subsections 17(b), (c) and (d)

In sum, section 17 sets forth several actions the Board may take with respect to cable television applicants. If the applicant has municipal consent and the Board finds that it

---

A Board finding of substantive arbitrariness in its usual sense is not required in all 17(d) appeals in order to reverse a municipal denial. The statute itself explicitly allows 17(d) certification by the Board where the municipality has not even considered the substance of the application, *i. e.,* where the municipality arbitrarily refused "to act upon an application." Section 17(d). Additionally, while the burden of proof implicit in the "arbitrary" standard may have to be met as to purely local issues, the Board's power to undo a 17(d) denial on the merits should not be so limited where the issue, for instance, is "public convenience and necessity" (section 16(d)), a matter primarily reserved for Board determination.

We note further that, in line with the legislative intent to balance municipal and state representation in the certification process, the Board may in certain circumstances prefer to remand the matter to the municipality for reconsideration rather than grant certification without the municipal consent, for instance where the municipality never dealt with the substance of the application because its denial was based on alleged procedural infirmities. Where a municipality has had no opportunity to examine the substantive aspects of an application, a "remand" of this sort may be preferable to direct Board certification under section 17(d) which would deny the locality the opportunity of contributing to the certification process. Such remand is similar in purpose to that suggested above (*supra* at 50) in section 17(b) proceedings.

conforms to the requirements of the Act, it will ordinarily grant certification. If the applicant does not meet the requirements of the Act, the Board will withhold certification.[15] In either case, the Board makes its determination based either on a *de novo* hearing or on the papers submitted to it if there is no hearing, including the information considered by the municipalities, giving consideration to the findings and conclusions of the municipality. If the applicant does not have municipal consent, it is ordinarily precluded from obtaining Board certification. However, in two situations the Board may grant a certificate without a municipal consent.

The first is where it determines pursuant to section 17(b) that for the benefit of the region a certificate should be granted regardless of the municipal decision. Should such certification "impair" another company's certificate, the Board must first obtain the approval of the holder of the impaired certificate and the municipality which granted the consent underlying the impaired certificate. Otherwise, no new certificate may issue. The second situation in which a cable television company may obtain certification without local consent is where the Board determines pursuant to section 17(d) that consent *should* have issued, but that it was arbitrarily denied by the municipality. The municipality should in both cases ordinarily have the opportunity to examine the application first. In the section 17(d) review, if the municipal action was based on matters of local concern, the Board in examining that action must decide if the municipality acted arbitrarily. In the section 17(b) review, while the Board may consider the intrinsic merits of the municipality's findings, the Board makes the decision to certify independent of municipal action.

---

[15]Even where no regionalization issue is involved, the Board has substantial discretion to deny an application approved by the municipality. *See* sections 2(d), 16(b), 16(d), 17(a), 27, 37, and 47.

## V.

### THE BOARD'S ACTION: 17(b) AND 17(d)

We now consider some other aspects of the Board's action under sections 17(b) and 17(d).

### A. *The Board's Action under Section 17(b)*

The only problem we see in the 17(b) proceeding arose from National presenting itself as an "objector" or an "aggrieved person" rather than as a competing applicant in its request for a hearing on Clear's certification application.[16] Were the effect of such a hearing (without notice to the applicant that the "objector" was really a competing applicant on regional grounds) to be unfair and prejudicial surprise to the applicant by the introduction of new evidence, its results could not be upheld. Here, however, the Board treated the procedural issues at some length below, see *Decision & Order, I/M/O Petition of Clear Tel. Cable Corp.*, Docket Nos. 735C–5007 and 746C–6028, 7/8/76, and *Hearing Examiners Report & Recommendation, I/M/O Application of Clear Tel. Cable Corp.*, Docket Nos. 735C–5007 and 746C–6028, 11/30/76. The Board ruled that all relevant evidence should be admitted and sufficient cross-examination of witnesses be allowed both parties; it further determined that Clear was not prejudiced by the proceedings.[17] In the future, as

---

[16]This "aggrieved person" designation is contemplated by the statute for a party who wishes to contest an application. Section 16(b) provides:

Upon receipt of a complaint from any person claiming to be aggrieved by the issuance of a certificate applied for, the board shall not issue such certificate without a hearing thereon, if it deems that there is a reasonable ground for such complaint.

[17]Clear claimed before the Appellate Division that it was unfairly prejudiced by National's submission of a plan at the regionalization hearings that was superior to the plan that the municipalities rejected. While we do not hold that the Board is prohibited from making findings of its own in such a situation (indeed, the hearing provided for in section 17(b) as well as other sections of the Act imply that the Board may, in its discretion, hear new evidence, make new findings, and allow applications to be amended), we

all parties concerned become more familiar with the method for presenting the regionalization issue, the potential of prejudice in these regionalization hearings will decrease. In the instant case, we will not upset the decision of the Board that Clear was provided adequate procedural safeguards in the presentation of its application, absent evidence that this procedural determination was arbitrary or capricious. *Campbell v. Department of Civil Service*, 39 *N.J.* 556 (1963).

We merely note further that whatever National's formal status in the proceeding was, the fact must have been well-known to all the other parties—Clear, the Townships of Dover and Berkeley, and the Board—that National was a competing applicant. The contest between Clear and National over the unserved beach areas had gone on for three years when the Board rendered its decision certifying National. National had had its section 17(d) application before the Board the previous year; the Board had denied it because it found the actions of the municipalities not to be arbitrary. National was in the process of appealing that order during the Clear application proceedings. Clear was aware of National's challenge to its consents: in Dover, both had competed for the same franchise; the hearing before the Board on Clear's application was held on National's motion and argued against by Clear; Clear was present to contest National's request for reconsideration of the Board's order on the section 17(d) application, where the Board characterized the action as follows: "This case is, in reality, a

---

assume that the Board will give due consideration to the findings of the municipality and its preference for a particular service as indicated by its issuing of consents. The proper place for an initial consideration of local issues is in the locality. Otherwise, the process of having the municipality make its decision will become a mere formality. In the present case, the decision to certify National and deny Clear's application was explicitly based on the effect a denial of National's application to obtain the Dover and Berkeley beaches could have on the Seaside Heights, Seaside Park and Lavallette beach customers' services. To make this regional determination it was proper for the Board to delve further than the municipalities had delved into evidence of the regional effect the grant to Clear would have.

dispute over whether petitioner or Clear is to serve the residents of the beach portions of Dover and Berkeley Townships." The townships of Dover and Berkeley had been made part of the regionalization proceedings pursuant to section 17(c) and had participated in the section 17(d) action. Given the complexity and protraction of the litigation that had preceded the final Board regionalization hearing, surprise to Clear seems most unlikely.

■ Having evidence before it regarding the regional advantages of both Clear and National, the Board determined that National could better serve the interests of the region. In reaching this conclusion, the Board followed the recommendation of the Hearing Examiner's report which was based on an examination of several considerations: the community of interest that existed between the beach residents of Dover and Berkeley, and those of Lavallette, Seaside Park and Seaside Heights (served by National) as opposed to the community of interest between the residents of Dover and Berkeley on the beach and those on the mainland (served by Clear); quality of service; efficiency in establishing service; and financial repercussions of a grant to one company upon the others. *Hearing Examiner's Report & Recommendations, I/M/O Application of Clear Tele. Cable Corp.*, Docket Nos. 735C–5007 & 746C–6028, 11/30/76, at 7. These were all proper considerations under section 17(b). The Hearing Examiner found that evidence on the "community of interest" was inconclusive as to either party, *Hearing Examiner's Report, supra*, at 21 (Finding 4), and that adequate service in this case could be provided by both Clear and National (Findings 7, 8 and 9). He therefore based his decision, to a large degree, on cost considerations. Finding that National would be able to establish service to the beach communities for less (Finding 11), and that without the added revenue from Dover and Berkeley National would be forced to increase its rates to customers in Lavallette, Seaside Heights and Seaside Park (Finding 12), the Hearing Examiner found for National. We defer to the expertise of the Board and the Hearing Exam-

iner where there is, as here, sufficient evidence in the record to support the agency's determination. *In re Heller*, 73 *N.J.* 292 (1977).

## B. *The Board's Action under Section 17(d)*

Because our decision is to reinstate the Board's order granting National certification on section 17(b) regionalization grounds, we need not reach the questions raised under section 17(d) concerning National's applications. However, as the issues raised below on this subject are of significance to subsequent adjudication at all levels, we will address what we consider to be the important problems. These include (1) whether a municipal denial is *per se* justified (and therefore not "arbitrary") if the municipality has recently granted consent to a different company; (2) whether a municipal denial is *per se* arbitrary where its only justification is that a grant might result in two companies operating therein, although in different areas; and (3) the degree of finality to be accorded to municipal and Board determinations and how that issue is to be resolved.

Clear argues that the denial of municipal consent to National was not arbitrary, as section 17(d) requires, because the Act does not contemplate overlapping cable television franchises. According to this view, once Dover and Berkeley had granted Clear municipal consents covering the entire municipalities, they were precluded from granting, acting upon or even looking at applications of another cable television company. This argument is without merit. The areas which would actually have been served, though in the same townships, were different. National did not wish to compete against Clear on the mainland—it wanted an exclusive franchise for the beach area only. There would have been no dual service, no "overlapping." Further, there is no indication in the Act that the Legislature intended to eliminate the opportunity for competition in the cable market, should a municipality determine that such competition would be in its best interests. In section 23(e) the Act explicitly refers to the municipality issuing "municipal consents to one or more

applicants." In section 2(c),[18] the Legislature included among the purposes of the Act the objective of providing "just and reasonable rates . . . without . . . unfair or destructive competition." The Legislature therefore contemplated some sort of competition, unless it is to be argued that all competition is "unfair or destructive." Whether a multiplicity of cable companies operating within one area constitutes "unfair or destructive competition" is of course within the fact-finding competence of the municipalities and the Board under sections 16(b) and 25.[19]

---

[18]Section 2 provides, in part: "The Legislature finds, determines and declares . . . (c) That the objects of such regulation are . . . (3) to provide just and reasonable rates and charges for cable television system services without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices."

[19]Section 16(b) provides:

b. Upon receipt of such application, the board shall . . . within 30 days of the receipt thereof, either issue the certificate applied for or order the director to schedule a hearing upon the application. No application shall be denied without a hearing thereon. In determining whether a certificate should issue, the board shall consider, in addition to the requirements of section 17, among other things, public convenience and necessity, the suitability and character of the applicant, the financial responsibility of the applicant, and the ability of the applicant to perform efficiently the proposed service and other service which may be required by public convenience and necessity during the term of the municipal consent. Upon receipt of a complaint from any person claiming to be aggrieved by the issuance of a certificate applied for, the board shall not issue such certificate without a hearing thereon, if it deems that there is a reasonable ground for such complaint.

Section 25 provides:

A municipal consent issued pursuant to this act shall conform in form and substance to all requirements of this act and of rules, regulations and orders duly promulgated by the director. It shall specify with particularity the territory to which it applies, and the term for which it is issued. Such term shall not exceed 15 years; but provision may be included for automatic renewal at the expiration thereof for an additional term not exceeding 10 years unless either the municipality or the company shall not later than 60 days before the expiration of the initial term serve upon the other party notice of its intention not to accept such renewal. No CATV company whose municipal consent or renewal thereof has expired shall be authorized to continue its operations unless prior to such expira-

Finally, we note that in fact most cable television companies will probably find themselves the only operator in a given municipality.[20]

The Board based its decision to uphold the municipalities' denial actions on the theory that the award of consents to Clear by Berkeley in 1970 and by Dover in 1974 made the issue of who would possess municipal consents *res judicata*, and that National's later applications were impermissible collateral attacks upon the townships' previous decisions. It held that the decisions of the townships of Berkeley in 1970 (before enactment of the Act) and Dover in 1974, that Clear should receive a consent, implicitly determined that National ought not to have a franchise. It interpreted the Act as providing for *one* municipal determination. The Appellate Division overturned this decision, reasoning that the judicial doctrine of *res judicata* did not apply in this case. 162 *N.J.Super.* 84 (App.Div.1978). We agree.

The extent to which any determination by a municipality or the Board under the Act precludes later reconsideration, revision or inconsistent action should not be measured by strict application of principles of *res judicata* or collateral estoppel. Whether a company should be allowed to operate in a municipality which has previously given its consent to another should depend on the Act and its purposes: *res judicata* and collateral estoppel influence such an issue only to the extent their underlying purposes, such as fairness and end of litigation, do not conflict with those public interests which are the underlying

---

tion it has obtained a certificate of approval from the board authorizing such continued operation, except that such a CATV company which has initiated proceedings to obtain such certification from the board prior to the expiration of the municipal consent may continue its operations pending the final disposition of such proceedings.

[20]The Board has awarded a "dual franchise" (certification of two companies in the same area) in Tenafly and Paramus, referring to its action as an "experiment." *See Decision and Order, I/M/O Applications of Micro Cable Comm. Corp. and Cablevision of New Jersey*, Docket Nos. 776C–6294 and 777C–6308, 9/28/78.

purpose of the Act. Given the changing circumstances that may bear on the wisdom of franchising another company—population increases, dissatisfaction with present operator, desire for competition or for two companies with different offerings or areas, change by municipality in its CATV objectives—the purposes of the Act are better served by allowing flexibility to the decision makers on this issue.

Section 23 of the Act provides in part that:

c. Notice of the receipt of such application, and of the hearing scheduled thereon, shall be published in at least one newspaper of general circulation in the municipality not later than the forty-fifth day prior to such hearing, and again not sooner than the fourteenth day nor later than the seventh day prior to such hearing. Additional applications may be received by the municipality until the fifteenth day prior to the hearing.

. . . . . . . .

d. The municipal governing body shall within 30 days after the conclusion of the hearing make a decision regarding the application or applications before it
. . . .

These provisions requiring notice of the hearing to be published[21] and that additional applications be accepted only until fifteen days before the hearing, along with the provision requiring one decision, indicate an intention on the part of the Legislature to consolidate the application process into a limited period of time. After that, a conclusion could be reached by the municipality, the company or companies granted consent might proceed upon these consents, and the municipality would not be burdened with a stream of late applications by companies who would not or could not take advantage of the procedure provided by the Legislature.

---

[21] *N.J.S.A.* 48:5A–23(c) requires notice of the hearing to be published in "at least one newspaper of general circulation in the municipality." It is quite probable that other interested companies in the region will receive sufficient notice in this manner. The Board itself could directly notify other companies operating in the region of the pending proceedings (under section 23(a) the Board—through its CATV office—receives a copy of all municipal applications).

It is uncontroverted that National and Clear were two of the four contestants for municipal consents at the hearing held in late 1973 in Dover. The language of the statute indicates a certain procedure which the Legislature intended applicants to follow, and it is reasonable to assume that is the only procedure the Legislature intended. *See* 2 *Am.Jur.*2d, Administrative Law § 498; *Tacoma v. Taxpayers of Tacoma*, 357 *U.S.* 320, 78 *S.Ct.* 1209, 2 *L.Ed.*2d 1345 (1958). National had an opportunity to present its proposal to Dover; and ·if there were no regional factors involved and if it were essentially the same application, National could not expect to have unlimited access to a municipality which had only a month before considered a similar application under similar circumstances.[22]

We need not decide how long this statutory bar, were it to apply, would last. Certainly, had National gone back to Dover with another application for the *mainland* within so short a time after the Board had certified Clear for that area, the statutory bar would have applied. There was no need here, however, for National to make a new municipal application. By its continued participation in, and opposition to, Clear's application for certification, it remained an applicant and preserved its right to receive the beach certificates through section 17(b). Apparently National assumed, understandably but, by virtue of this opinion, mistakenly, that its only route for such certification was via a new municipal application followed by a 17(d) appeal in the event of a municipal denial. While we therefore need not reach the 17(d) issue, it is apparent that the municipal denial— for that was the effect of Dover's action—was not *per se* arbitrary. Solely from a municipal vantage point, and that is how section 17(d) should ordinarily be judged, Dover would appear to have been justified in refusing to consider an appli-

---

[22]We need not decide whether Dover's refusal to consider National's subsequent application, which was limited to the beach area (the first covered the entire Township) would have been arbitrary if, prior thereto, the Board had restricted Clear's certification by excluding the beach area.

cant which it had so recently rejected. Resolution of the entire matter by the Board would have been clearer, however, had it simply declined to rule on the 17(d) appeal and thereafter indicated it was moot in view of its section 17(b) ruling.

The situation presented in Berkeley is different. The record indicates that National was never actually heard by the municipality on its application, and that—because whatever hearing did take place was held before the Act was effective—it never had the opportunity to be heard. While in Dover National's application for the entire municipality had been heard only a month before it submitted its modified beach area application, in Berkeley four years had elapsed since Clear's original submission of its cable application (not pursuant to the Act). The Board's later certification in 1973, allowing Clear to operate in areas it was already serving, was based on the "grandfather" clause. No new hearings had been held since 1970. Therefore, when National submitted its application to Berkeley, it was submitting it to a township where it had not previously had the opportunity to be heard, and where there were numbers of unserved customers.

Consideration of National's application would not have been a duplicative exercise in Berkeley, for Clear had indicated by its action that it could not provide immediate service to the beach. Furthermore, since no application had ever been subject to the competitive hearing of section 16(b), the statutory bar is not applicable.

The sole justification put forth by the Township of Berkeley for not accepting National's application, other than the exclusivity rationale which we have already rejected, is that the municipal governing body did not want to have to administer more than one cable company. That reason does not justify a denial. Fairness both to National, which had never had the opportunity to be heard, and to the beach residents of Berkeley, who were still unserviced, would indicate that some consideration of National's proposal was in order. Convenience to the govern-

ing body does not overcome the stated objective of the Act, "to promote adequate, economical and efficient cable television service to the citizens and residents of this State," section 2(c)(1). *See* CATV Study Commission, *Report,* at 31–32.

Again, there is no need to rule on National's 17(d) appeal from Berkeley's denial, for reasons similar to those expressed concerning the 17(d) appeal from Dover's action. National should have designated its appeal as an application to the Board under 17(b). Such application would be determined by the Board *de novo,* without any question of the arbitrariness of the municipal denial, with consideration given only to the intrinsic merit of the municipal action.

## VI.

### SUMMARY

In summary, we reinstate the decision of the Board on section 17(b) grounds, denying Clear's application to operate on the beach areas of Dover and Berkeley, and granting certification to National. We find that the Board has authority to grant certification against municipal protest in cases where adverse regional effects would occur were certification granted to another applicant, and that the Board's powers under 17(b) should be liberally construed. We defer to the Board's ultimate decision on the regionalization issue, absent a showing that the decision rendered was unsupported by substantial evidence in the record, where as here the process did not impair the terms of another existing certificate and where municipal concerns were sufficiently considered.

We further hold that the Board has the power to consider amended applications which differ from those presented to the municipality, but should exercise that power with discretion so as not to erode municipal participation in the certification process.

We hold that the arbitrariness of a municipal denial must be determined from the particular facts of each case. A refusal even to consider an application is not in all cases arbitrary. If the applicant was recently unsuccessful before the municipality after a hearing on similar issues, such refusal may be justified. But if the applications are dissimilar, if the second raises regional issues not involved in the first, or if circumstances—or points of view—have changed, refusal to consider may be arbitrary. In any event, the municipality and the Board are not limited by the principles of *res judicata* and collateral estoppel. Their determinations, including whether to consider an application, are to be guided by the provisions of the Act, including those which contemplate that consents will ordinarily issue after a single consolidated hearing in which all interested applicants may participate. Those provisions should be applied to achieve the central purpose of the Act: to assure an effective cable television system that meets the needs of the appropriate region and its citizens.

For the reasons set forth above, we reverse the judgment of the Appellate Division and reinstate the decision of the Board.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For affirmance*—none.