NYT CABLE TV, PLAINTIFF–RESPONDENT, v. HOMESTEAD AT MANSFIELD, INC., HOMESTEAD AT MANSFIELD HOME-OWNERS ASSOCIATION, INC., MICHAEL LAINO AND DANIEL QUIGLEY, DEFENDANTS–APPELLANTS, AND NEW JERSEY BOARD OF PUBLIC UTILITIES, RESPONDENT.

IN THE MATTER OF THE APPLICATION OF TKR CABLE COMPANY FOR ACCESS TO PREMISES KNOWN AS SOCIETY HILL AT PISCATAWAY PURSUANT TO N.J.S.A. 48:5A–49 AND N.J.A.C. 14:18–3.10(C)(1).

Argued November 9, 1987—Decided June 28, 1988.

*W. James MacNaughton* argued the cause for appellant Society Hill at Piscataway Condominium Association, Inc. (A–43/44) and submitted a letter brief on behalf of *amici curiae* Hovbilt, Inc., K. Hovnanian at Piscataway, Inc., Society Hill at Piscataway Condominium Association, Inc., K. Hovnanian at Bernards, Inc., Society Hill at Bernards Condominium Association, Inc., RCK Cable Company, and Channel One Systems, Inc. (*Schenck, Price, Smith & King,* attorneys; *W. James MacNaughton* and *Douglas S. Brierley,* on the briefs).

*Douglas K. Wolfson* argued the cause for appellant K. Hovnanian at Piscataway, Inc. (A–43/44) (*Greenbaum, Rowe,*

*Smith, Ravin, Davis & Bergstein,* attorneys; *Mr. Wolfson* and *Bruce D. Greenberg,* on the briefs).

*Philip B. Seaton* argued the cause for appellants Homestead at Mansfield, Inc., et al. (A–42) (*Kozlov, Seaton & Romanini,* attorneys).

*Francis R. Perkins* argued the cause for respondent TKR Cable Company, (A–43/44) and *amicus curiae* New Jersey Cable Television Association (A–42) (*LeBoeuf, Lamb, Leiby & MacRae,* attorneys; *Francis R. Perkins, Thomas C. Kelly* and *Ruth A. Bosek,* on the briefs).

*Peter J. Pizzi* argued the cause for respondent NYT Cable TV (A–42) (*Connell, Foley & Geiser,* attorneys).

*Susan B. Vercheak,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

*Jeffrey L. Reiner* submitted a brief on behalf of *amicus curiae* Ocean Cablevision Associates (*Meyner and Landis,* attorneys).

PER CURIAM.

The members of the Court being equally divided, the judgment of the Appellate Division is affirmed.

HANDLER, J., concurring.

In this case we are asked to examine whether the statutory scheme found in the Cable Television Act (the "Act"), *N.J.S.A.* 48:5A–1 to –53, and more specifically its access rights section, *N.J.S.A.* 48:5A–49 ("Section 49"), is constitutional. There can be no quarrel with the proposition that, under the Act, entry on any property and the installation of cable television constitutes the taking of property for which just compensation must be paid as a matter of constitutional due process. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 *U.S.* 419, 102 *S.Ct.* 3164, 73 *L.Ed.*2d 868 (1982). Within this constitutional frame-

work we must resolve two issues: (1) whether Section 49 as enacted can reasonably be construed to require the payment of just compensation; and (2) if not, whether the Legislature would have wanted Section 49 to be so construed in order to preserve the constitutionality—and the survival—of the overall statutory scheme of the Act.

The dissenting opinion, taking the position that both of these issues must be resolved against the constitutionality and survival of the regulatory scheme, presents in detail the procedural posture and relevant facts of this appeal. *Post* at 36–44. I readily incorporate this presentation as a basis for explaining separately why I conclude that the statutory scheme, regardless of its wisdom or efficacy, is constitutional. It is, I submit, entitled to be upheld by the Court, which should leave the Legislature free to deal with the subject as it sees fit.

I.

I believe that Section 49 is susceptible of an interpretation that would, as a matter of imputed legislative interest, require the payment of just compensation for the entry on property for purposes of installing cable television. Section 49 can be viewed as having distinctive segments, each governing different aspects of the relationship between the several parties involved in the installation of cable television. So viewed, the statute can be read to permit—not to bar—the payment of compensation to the owner of property for the rights of access.

The initial part of Section 49 can be understood as primarily governing the relationship between owner and tenant. It provides that

[n]o owner of any dwelling or his agent shall forbid or prevent any *tenant* of such dwelling from receiving cable television service, nor demand or accept payment in any form as a condition of permitting the installation of such service in the dwelling or portion thereof occupied by such tenant as his place of residence, nor shall discriminate in rental charges or otherwise against any such tenant receiving cable television service ...

[*N.J.S.A.* 48:5A–49 (emphasis added).]

This clearly focuses on owners' treatment of their tenants, prohibiting them from demanding any payment from these *tenants* for installation of cable television. *See Princeton Cablevision, Inc. v. Union Valley Corp.,* 195 *N.J.Super.* 257, 270 (1983).

The second part of Section 49 deals essentially with the nature or consequences of installation, permitting owners to require that the cable service not be installed in a damaging manner. It provides

> that such owner or his agent may require that the installation of cable television facilities conforms to all reasonable conditions necessary to protect the safety, functioning, appearance and value of the premises and the convenience, safety and well-being of other tenants ...
>
> [*N.J.S.A.* 48:5A–49.]

In its final aspect, Section 49, quite apart from its basic prohibition against demanding payment from tenants, provides that owners can demand that cable companies pay them for any damages done to their property as a result of faulty installation. The Section thus states

> that a cable television company installing any such facilities for the benefit of a tenant in any dwelling shall agree to indemnify the owner thereof for any damage caused by the installation, operation or removal of such facilities and for any liability which may arise out of such installation, operation or removal. [*Ibid.*]

■ I do not suggest that it is linguistically impossible to read Section 49, as does the dissent, namely, that the statute plainly, flatly, absolutely bars the payment of just compensation to an owner by a cable television company for rights of access and installation. Nevertheless, it is plausible to understand Section 49 as not expressly or impliedly prescribing such a prohibition.[1] The language does present alternative interpretations.

---

[1] NYT Cable urges the Court to adopt the reasoning of the opinion in *Princeton Cablevision, supra,* under which a "generous reading" is made of the requirement that cable companies indemnify owners for any damage caused so

## II.

*N.J.S.A.* 48:5A–49 is not neutral to the subject of damages; it can, however, be viewed as being neutral toward the issue of compensation. Its express language can be said neither to prohibit nor to require the payment of just compensation. The failure explicitly to require the payment of just compensation, however, does not mandate the conclusion that the statute bars the payment of such compensation, rendering the statute unconstitutional. Whether a statute must be so read and thus deemed unconstitutional turns on the intent of the Legislature.

One of the basic guidelines in analyzing the constitutionality of a statute is "the presumption that the legislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner." *State v. Profaci,* 56 *N.J.* 346, 349 (1970); *see Alling St. Urban Renewal Co. v. City of Newark,* 204 *N.J.Super.* 185, 191 (App.Div.1985), certif. den., 103 *N.J.* 472 (1986). The articulation of all of the essential elements demonstrating such legislative intent need not appear in the statutory language itself. *See Profaci, supra,* 56 *N.J.* at 349; *Lomarch Corp. v. Mayor of Englewood,* 51 *N.J.* 108, 113 (1968); *Juzek v. Hackensack Water Co.,* 48 *N.J.* 302, 315 (1966).

This Court has found that statutory schemes involving takings can be said implicitly to authorize the payment of just compensation despite the absence of any language to this effect. Thus, in *Lomarch, supra,* the Court noted that a statute

> often speaks as plainly by inference as by express words. The details for the accomplishment of a statutory objective do not have to be specifically spelled out with particularity. It is not always essential in order to avoid unconstitutionality, that provisions to insure compliance with the Federal or State consti-

---

as to have this be understood as actually requiring the payment of compensation. 195 *N.J.Super.* at 270. This argument is unpersuasive. The statute's reference to "damage *caused by* the installation, operation or *removal of* facilities ..." (emphasis added), by its own wording clearly indicates that the Legislature was referring to actual physical damage caused to property by cable installation, etc., and not to compensation for the taking of this property.

> tution be spelled out in detail. Whenever the legislature authorizes ... action which, if taken, would require, under the constitution, that just compensation be paid, it follows that if ... [the authorized party] wishes to exercise that power it must comply with the constitutional mandate and pay. The statute is not constitutionally defective for failure to expressly provide for compensation.
>
> [51 *N.J.* at 113 (citation omitted).]

The statutory silence of Section 49 concerning just compensation is similar to that dealt with in *Lomarch*. A comparable understanding, viewing the Act as implicitly authorizing the payment of just compensation to owners, is readily available.

The scheme of Section 49 can be distinguished from situations where a statute flatly and irreversibly bars compensation. For example, in *Storer Cable T.V. of Florida, Inc. v. Summerwinds Apartments. Assocs. Ltd.*, 493 *So.*2d 417 (Fl.1986), the Florida Supreme Court dealt with a statute that explicitly declared "nor shall [a] ... cable television service be required to pay anything of value in order to ... provide such service...." Fla.Stat. § 83.66(1) (held unconstitutional). The lack of any room to maneuver with this language thus precluded any saving interpretation. *Cf. New Jersey Board of Higher Education v. Shelton College*, 90 *N.J.* 470, 478 (1982) (court can devise saving interpretation only if statute is 'reasonably susceptible' of such construction."). As noted, the statutory scheme and language of the Act do not plainly provide such an absolute prohibition against the payment of just compensation to owners for the taking of property involved in the installation of cable television service.

Because the constitutionality of a statute is at stake, our judicial mission would not be ended even if the statutory language did not allow the implication of authority to pay just compensation under the Act. The Court in this situation is importuned to consider whether a constitutional cure, imputing or adding such authority to Section 49, can be effected through the use of "judicial surgery." As we noted in *Right to Choose v. Byrne*, 91 *N.J.* 287, 311 (1982), "[i]t is our duty to save a statute if it is reasonably susceptible to a constitutional interpretation." *See Shelton College, supra*, 90 *N.J.* at 478. In

necessitous circumstances when the constitutionality of a statute is threatened, we have excised constitutional defects or engrafted new meanings to assure its survival. *See, e.g., Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 104 (1983); *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75 (1980). This is done, however, only where it is determined that the Legislature would have wanted the statute to survive as modified rather than to succumb to constitutional infirmities. *Jordan v. Horsemen's Benevolent and Protective Ass'n,* 90 *N.J.* 422, 431–32, 435 (1982). Stated otherwise, before using "judicial surgery" a court always "must ascertain whether the Legislature would have declined to adopt the statute or would have adopted it with the constitutional interpretation." *Byrne, supra,* 91 *N.J.* at 311 (citing *United States Chamber of Commerce v. State,* 89 *N.J.* 131, 152 (1982)).

I agree with the view expressed by the court below, *NYT Cable TV v. Homestead at Mansfield, Inc.,* 214 *N.J.Super.* 148, 160 (App.Div.1986), as well as the prior Appellate Division holding in *Princeton Cablevision, supra,* 195 *N.J.Super.* 257. A review of the development of the cable industry and legislative response to it indicate that the Legislature would be satisfied to continue this statutory scheme, even though it may, in the opinion of some, need modification, adjustment, or, indeed, replacement. Put somewhat differently, whatever may be awry with the regulatory scheme, extrinsic considerations suggest that the Legislature has not abandoned the statute and is not indifferent to its survival.

In 1972, cable television systems brought in distant and local over-the-air signals via a community antenna and coupled that over-the-air programming with locally produced programming that began to include uninterrupted movies in the late 1960's and early 70's. *See* H.Rep. No. 934, 98th Cong., 2d Sess. 20–21, *reprinted in* 1984 U.S. Code Cong. & Admin. News 4655, 4658. At that time, there was no satellite programming system that would deliver uninterrupted movies, sports, and entertainment

programming to any cable system, and only 12–15% of the population received cable television. *Ibid.* It was not until 1975 that a division of Time–Life Inc., the Home Box Office (HBO), began to deliver such satellite programming. *Ibid.* This development changed the cable industry, spurring its tremendous growth.

At the same time in 1972, Master Antenna Television (MATV) systems were available to provide television service to larger multi-unit buildings and developments. 2 C. Ferris, F. Floyd & T. Casey, *Cable Television Law: A Video Communications Practice Guide* § 21.01 (1987). These MATV systems, like the then existing cable television systems, brought better reception for over-the-air broadcasting signals to residents. *Ibid.* However, MATV systems did not add in other programming, as some cable services had started to do, so that there was no editorial control by the operator, usually the owner of the building. *See* First Report and Order, Docket No. 20,561, 63 *F.C.C.*2d 956, 996 (1977). Thus, MATV systems operated simply to provide better reception for over-the-air broadcast signals. *Ibid.*

SMATV systems first began to appear in 1979, as receive-only earth stations that could pick up satellite programming were hooked into master antenna television systems. D. Brenner & M. Price, *Cable Television and Other Nonbroadcast Video,* § 13.01 (rev. ed. 1985). The four year time lag between the introduction of satellite programming in 1975 and development of SMATV occurred in large part because it was not until 1979 that the FCC decided to de-regulate the acquisition and use of the technology needed for SMATV receive-only earth stations. *See* Regulation of Domestic Receive–Only Satellite Earth Station, 74 *F.C.C.*2d 205 (1979); D. Brenner & M. Price, *supra,* at § 13.01.

The situation in 1972 is parallel to the situation that exists currently. Today, both master antenna television and cable television systems offer satellite programming, using earth-sta-

tions that receive the satellite signals. The relationship between these two competing technologies is thus similar to that which existed in 1972 when the Legislature passed the Act, although there was a somewhat wider gap between the types of programming available. This gap (uninterrupted movies on some cable systems) should not be over-emphasized, however, because the key development in cable programming, satellite services, had not been introduced in 1972. Back then MATV and cable systems offered similar advantages to consumers, namely better reception of over-the-air signals. In effect, mandating the right of access for cable companies results in no more than equalizing the competitive position of cable to SMATV, as the latter by its nature already has access to any customer who desires it since SMATV is itself set up in the complex or development where the customer lives.

It is of some significance that the initiation of SMATV systems, in 1979, was several years before the Legislature's amendments of the Act in 1982 and 1983. These two amendments broadened Section 49 of the statute to encompass more multiple unit areas. Because SMATV was at the time a growing "new technology" that had by then acquired an estimated 500,000 subscribers, 2 C. Ferris, F. Lloyd & T. Casey, *supra*, at § 21.02 (citing M. Howard and S. Carroll, "SMATV: Strategic Opportunities in Private Cable," *National Association of Broadcasters*, Nov., 1982, p. 1), it must be presumed that the Legislature was aware of these systems. Moreover, *Loretto*, *supra*, 458 *U.S.* 419, 102 *S.Ct.* 3164, 73 *L.Ed.*2d 868, had recently been decided with its clear mandate that just compensation was a concomitant condition for cable television access. Hence the Legislature cannot be viewed either as indifferent or passive in light of these relevant circumstances—the burgeoning technology in the field and the constitutional understanding of just compensation. Rather, the Legislature's actions in 1982 and 1983 demonstrate its intent to continue and broaden Section 49 and the legislation's scheme. These amendments are not

simply legislative thumb twirling awaiting only a court's confirmation of the statute's demise.

There is no need for the Legislature to expressly state its desire to preserve its regulatory scheme. While it is similarly possible that it might have remained inactive despite a lack of any approval for the Act, *i.e.*, there is no absolute requirement for the Legislature to express disapproval by actually repealing legislation, there is no such inactivity here. Even minor enhancements of a statutory scheme reflect approval of it and a desire to see its continuation.

The obvious legislative purpose to continue and strengthen the statutory regulation of cable television,[2] coupled with the legislature's presumed awareness of the growth of SMATV systems and the requirement for just compensation, indicates strongly that the Legislature intended that Section 49 be applied through favorable interpretation, or be constitutionally cured of any possible defect, rather than fall into a regulatory limbo without even the benefit of express repeal. The changes in video technologies support a construction of the Section that would require just compensation for access consistent with the *Loretto* decision.

### III.

In eschewing judicial surgery in favor of the judicial invalidation of the Act, the dissent expresses its unhappiness with the present regulatory scheme. The dissent relies heavily on its own independent economic analysis to justify its proffered resolution of important public policy issues. The issues implicated in regulating this industry, I submit, clearly should be reserved to the Legislature. I question the dissent's tacit assumption that there has been legislative inaction in the face

---

[2] A similar interest on the federal level in encouraging the growth and development of cable systems is reflected in the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521–559. *See City of New York, et al. v. F.C.C.,* —— U.S. ——, 108 *S.Ct.* 1637, 100 *L.Ed.2d* 48 (1988).

of industrial change evincing legislative indifference to anything that is occurring in this field. The assumption of legislative quiescence is simply incorrect, because it fails to give due consideration to the Act's amendment in 1982 and 1983.

In analyzing the constitutionality of legislation, one of the most basic of presumptions is "that a statute will not be declared inoperative and unenforceable unless it is plainly in contravention of a constitutional mandate or prohibition." *Profaci, supra,* 56 *N.J.* at 349 (citing cases); *see also Gundaker Central Motors, Inc. v. Gassert,* 23 *N.J.* 71, 81 (1956), app. dismissed 354 *U.S.* 933, 77 *S.Ct.* 1397, 1 *L.Ed.*2d 1533 (1957) (duty of court to uphold legislation unless there is no room for doubt as to its violation of constitutional provisions). The fact that the Act was twice recently amended is, if anything, indicative of a legislative understanding that its regulatory scheme is alive (if not well). I believe therefore that even if the Legislature had been totally inert, it would be a mistake to devine from this a legislative intent that its regulatory scheme, already moribund, should be permitted to expire. It does not follow that when the legislature fails to act, particularly in an area already covered by legislation, such inaction reflects only legislative indifference or simple inertia, despite ongoing change in a particular field. Such legislative immobility or silence can indicate a popular or majoritarian feeling that no statutory change is necessary, or that a consensus for change had not emerged or crystallized, or simply that the subject matter does not have a high priority on the legislative agenda. But, when a court decides a case that forces the legislature to respond, it not only galvanizes the legislature into action when it would, reasonably, prefer not to take action, but reorders legislative priorities. "The court's decision obliquely serves as a kind of 'judicial initiative and referendum.'" Handler, "Social Dilemmas, Judicial (Ir)resolutions," 40 *Rutgers L.Rev.* 1, 25 (1987).

In this case it is clear that there is no requirement mandating that the Act must be read in a fashion that would

find it in contravention of a provision for just compensation. Instead, we are faced with two possible understandings of statutory language. As a general rule, where there are two possible interpretations, the one that renders an act constitutional will be deemed to express the legislative intent. *Ahto v. Weaver,* 39 *N.J.* 418, 428 (1963); *City of Clifton v. Passaic County Bd. of Taxation,* 28 *N.J.* 411, 422 (1958); *State v. Fischer,* 183 *N.J.Super.* 79, 81 (Law Div.1982); 2A N. Singer, *Sutherland Statutory Construction* § 45.11 at p. 46 (4th ed. 1985). Therefore, even if a constitutionally destructive reading of the Act were available, the fact that a viable alternative exists that favors constitutionality would be controlling.

## IV.

The Act impliedly authorizes the payment of just compensation and is constitutional. Furthermore, by empowering the Board of Public Utility Commissioners (BPU) to "render all decisions necessary to enforce the provisions of the act ...," *N.J.S.A.* 48:5A–9(c), it may be read as authorizing that agency to create a compensation mechanism.

There is no clear indication that to the extent just compensation must be paid under the Act, the Legislature intended that awards of compensation be governed exclusively by the provisions of the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 to –50. From a constitutional vantage, the BPU regulatory scheme for permitting the determination of just compensation appears reasonable and valid. From a statutory standpoint also the regulatory scheme is valid. *See Princeton Cablevision, supra,* 195 *N.J.Super.* at 270–71. Nevertheless, there is no need directly to rule on the validity of this compensation mechanism. There is good sense, in this setting, in the admonition that "the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary." *Pennell v. San Jose,* —— *U.S.* ——, 108 *S.Ct.* 849, 99 *L.Ed.*2d 1, 13 (1988) (quoting *Hodel v. Virginia Surface*

*Mining & Reclamation Assn. Inc.*, 452 *U.S.* 264, 294–95, 101 *S.Ct.* 2352, 2370, 69 *L.Ed.*2d 1, 27–28 (1981)).

V.

In sum, Section 49 can be construed as requiring just compensation. This comports with constitutional standards and assures a regulatory scheme as opposed to a governmental vacuum. Further, there is no sufficient indication that the Legislature would prefer the demise of the legislative scheme rather than its preservation through judicial surgery. Finally, there is no reason at this time to find the current BPU created scheme for achieving just compensation to be invalid or inappropriate.

These reasons impel me to affirm the judgment below. Justices O'Hern and Garibaldi join in this concurrence.

STEIN, J., dissenting.

In this case an equally divided Court saves from invalidity § 49 (*N.J.S.A.* 48:5A–49) of the Cable Television Act (the "Act"), *L.*1972, *c.* 186 (*N.J.S.A.* 48:5A–1 to –53), by according to it an interpretation diametrically different from its plain meaning. It reaches this result because of its understandable reluctance to hold unconstitutional an act of the Legislature. However, in saving the statute—a quite extraordinary feat in this case—the Court's holding has the effect of extending cable television companies' mandatory right of access to multi-family dwellings already serviced by a competitor offering services technologically comparable to cable television. Thus, although prompted by a laudable desire to show deference to a co-equal branch of government, the Court's decision results in § 49's application in a context that was never contemplated, much less intended, by the Legislature.

I view this case as one in which the respective functions of the judicial and legislative branches would best be acknowledged by invalidating, rather than rewriting, § 49 of the Act. I would hold § 49 to be unconstitutional, and permit the Legisla-

ture to determine for itself how best to reconcile the technological and regulatory changes in the cable industry with the right of access accorded to cable companies by the Legislature in 1972 when cable television was a relatively new and developing technology.

## I

In 1982 the United States Supreme Court decided *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 *U.S.* 419, 102 *S.Ct.* 3164, 73 *L.Ed.*2d 868, holding that the installation, pursuant to a New York State statute, of cable television wires and equipment on the roof and sides of a five-story apartment building constituted a "taking" of property for which just compensation is due under the fifth and fourteenth amendments of the constitution. In these consolidated cases two authorized cable television companies, invoking the access rights conferred by § 49 sought to install cable television facilities in housing developments in Piscataway and Mansfield Township. Petitioners, K. Hovnanian at Piscataway and Society Hill at Piscataway Condominium Association, Inc. (petitioners), and defendants, whose economic interests are adverse to the cable companies', opposed their right of access, and challenge the constitutionality of § 49 of the Act. Petitioners and defendants assert that § 49 has been invalidated by the *Loretto* decision since it authorizes the installation of cable television facilities without requiring the payment of just compensation. The Appellate Division in separate opinions, one unpublished and one published, *NYT Cable TV v. Homestead at Mansfield*, 214 *N.J.Super.* 148 (1986), upheld the constitutionality of the Act by construing § 49 to require cable companies to pay compensation for the right of access.

By affirming the judgment of the Appellate Division, the Court upholds the constitutionality of § 49 of the Act, sustaining a construction of the statute that mandates the payment by cable companies of compensation for the right of access. My

reading of the statute persuades me that at the time of its enactment in 1972, ten years before the *Loretto* decision, the Legislature's unequivocal purpose was to permit the installation of cable television services without the payment of any compensation by the cable companies for the privilege of installing their equipment. Accordingly, I view any interpretation of § 49 that requires the payment of compensation by cable television companies to be contradictory to the Legislature's plainly expressed intent.

Moreover, the record in this case informs us that since the adoption of the Act in 1972, new technologies have been developed that seek to compete with cable television in certain markets, and significant changes have occurred in the allocation of regulatory authority over the cable television industry between the federal and state governments. Therefore, even if the Court could devise a constitutionally valid interpretation of § 49, not contradictory of the statute's plain meaning, I would not adopt it since the changes in the industry leave me with no confidence that the Legislature would deal with this issue today as it did in 1972. Accordingly, I dissent.

## II

Although the two cases consolidated in this appeal have different factual backgrounds, the essence of the dispute is the same. In each case, a real estate developer had made available to the residents of a new development a Satellite Master Antenna Television System (SMATV)[1] capable of competing

---

[1] A Master Antenna Television System (MATV) is a system "which links by hardware a number of units in a multi-unit building or building complex to a single external television antenna." Hamburg, *All About Cable* § 5.09 at 5–22 (1986 rev.). "A satellite master antenna system (SMATV) is simply an MATV system to which a receive-only satellite earth station has been added." *Id.; see IMO Earth Satellite Communications, Inc.,* 95 *F.C.C.*2d 1223, 1224 (1983). The SMATV systems developed as an alternative to cable, primarily in areas where the cable franchise disputes left viewers without access to the premium programming that could be provided by SMATV or cable. Noam, *The "New"*

with the programming offered by the cable companies. In both cases the developers attempted to protect their economic interests by denying access to the cable companies or by compelling the payment of substantial compensation in return for the right of access. The facts of each case warrant separate discussion.

## IMO TKR Cable Company

TKR Cable Company (TKR) is a cable television company authorized to operate in the Township of Piscataway. Society Hill at Piscataway is a large condominium development within the Township developed by K. Hovnanian at Piscataway, Inc. (Hovnanian). When completed the project will have over five hundred units in forty-five separate buildings.

In 1985 Hovnanian and TKR entered into a "joint trench" agreement, which contemplated that TKR would provide cable television service for the project, installing its cable wires in trenches to be opened and used for the development's other utility services. Because of difficulties in obtaining materials and construction crews on short notice, TKR failed to install its equipment while the trenches were open. Nevertheless, TKR wired six buildings at Society Hill before it was ordered by Hovnanian in August 1985 to stop all cable installation.

During 1985 Hovnanian began installing its own private cable television system, using an independent Satellite Master Antenna Television System (SMATV). Its system offers essentially the same programming as TKR.

Early in 1986 TKR renewed its efforts to gain access to the development. Acting pursuant to *N.J.A.C.* 14:18–3.10, a regulation adopted by the Board of Public Utilities (BPU) governing access by cable companies, TKR notified Hovnanian of its intent to install cable television equipment at Society Hill and tendered the one dollar in compensation required by the regula-

tion. *See N.J.A.C.* 14:18–3.10(a). Hovnanian communicated to TKR its concerns about the proposed installation and suggested a meeting. In March 1986, TKR filed a petition with the BPU seeking access to Society Hill. See *id.* at § 3.10(c). TKR alleged that Hovnanian was delaying TKR's access so that it could complete its own SMATV system, thereby denying TKR its "statutory marketplace" and depriving Society Hill residents of the right to choose between competing systems. Hovnanian and Society Hill at Piscataway Condominium Association, Inc. (Society Hill Association) opposed TKR's petition, contending that the proposed cable installation would damage existing facilities, utility lines, and landscaping, and asserting that the one-dollar fee established by the BPU's regulation was inadequate.

The BPU summarily granted TKR's petition, ordering Hovnanian and the Society Hill Association to permit TKR to complete its installation of cable television service, and requiring TKR to post a $25,000 performance bond to cover any unrepaired damage to the property. The BPU also permitted Hovnanian and the Society Hill Association to pursue claims under *N.J. A.C.* 14:18–3.10(d) to –3.10(f) for additional compensation through the Office of Administrative Law.

After the Society Hill Association unsuccessfully attempted to stay the BPU's order, Hovnanian and the Association filed separate appeals from the access order, which were consolidated by the Appellate Division.[2] In an unreported opinion the

---

[2]Hovnanian and the Society Hill Association filed a joint brief, in which the following arguments were made:

    1. The Association and Hovnanian were denied due process because property was taken without notice or hearing.

    2. Section 49 is invalid because it precludes the payment of just compensation and does not provide any procedure to determine just compensation prior to the taking.

    3. Section 49 is unconstitutional because it does not provide for a judicial determination of just compensation.

Appellate Division affirmed the BPU's order, concluding specifically that the notice and hearing afforded petitioners by the BPU were adequate, and rejecting the remaining arguments on the basis of its opinion in *NYT Cable TV v. Homestead at Mansfield, supra,* 214 *N.J.Super.* 148. We granted certification. 107 *N.J.* 154 (1987).

### *NYT Cable TV v. Homestead at Mansfield, Inc.*

This matter involves three separate appeals, consolidated by the Appellate Division and arising out of the efforts by NYT Cable TV (NYT), the authorized cable operator in Mansfield Township, to install its cable facilities in an 1187–unit planned adult community developed by Homestead at Mansfield, Inc. (Homestead). In addition to Homestead, defendants include the Homestead at Mansfield Homeowners Association (the Association), and the officers and owners of Homestead, Michael Laino and Daniel Quigley.

A proposed feature of the Homestead development was a "two-way" cable television network that would provide normal cable television programming by linking the units with an SMATV system, and would also permit the owners to transmit signals from their units to central locations in the development. Thus, the proposed SMATV system would enable unit owners, for example, to communicate with the development's security staff to summon medical or emergency assistance.

---

4. The Eminent Domain Act provides the only proper procedure for determining the condemnation of property and the payment of just compensation.

5. The access given private cable companies by Section 49 is unconstitutional because no public purpose or use is served by the condemnation power exercised by private cable companies.

6. The BPU order unconstitutionally takes the Association's property prior to the determination of just compensation.

7. *N.J.A.C.* 14:18–3.10 is unconstitutional because it fails to provide a fair and impartial method to determine just compensation.

When Homestead initially received a communication from NYT seeking access to the development to install its cable equipment, it advised NYT that it desired a "two-way" cable system. NYT offered to install a two-way system, but one that did not offer all of the features contemplated by Homestead. Communication between Homestead and NYT did not resolve the issue. In May 1982, Homestead advised NYT that its proposed system was inadequate, that Homestead would proceed to install its own SMATV system, and that NYT would not be afforded access to the development to install its cable equipment. Homestead formed its own cable television company in 1983, which began development of the SMATV system at a projected cost of $175,000 to $200,000.

In early 1984 NYT resumed its effort to gain access to the Homestead development. When Homestead persisted in refusing access, NYT instituted an action in the Chancery Division claiming an absolute right of access under *N.J.S.A.* 48:5A–49 and seeking to enjoin Homestead from interfering with such access. This action resulted in an order entered in July 1984 that denied all injunctive relief, determined NYT's right of access to be subject to terms and conditions to be prescribed by the BPU, and transferred the matter to the BPU for further proceedings. After the July 1984 order was certified as a Final Judgment, defendants appealed to the Appellate Division.

In reliance on the Chancery Division's ruling that the BPU should determine the conditions of access, NYT initiated a separate access proceeding against defendants before the BPU's Office of Cable Television. This matter was referred to the Office of Administrative Law as a contested case, and a prehearing order characterized the issues as follows:

(1) whether NYT was entitled to access to the development; (2) whether the BPU could grant immediate access or could only authorize NYT to proceed under the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 *et seq.;* (3) whether, assuming NYT otherwise had a right of access, it should be curtailed because of the public interest in the bi-directional system; (4) the terms and conditions of access; and (5) whether the BPU could make the determination of the amount of just compensation.

At the administrative hearing, the proofs demonstrated that the similarity in programming offered by the NYT and Homestead Cable systems would probably result in residents choosing one system or the other, but not both, and that the economic feasibility of the SMATV system could be threatened by NYT's proposed installation. The parties also produced expert testimony concerning just compensation for NYT's access and installation. NYT's expert testified that the installation would cause no reduction in Homestead's value and suggested that $1.00 was adequate compensation. Defendants' expert suggested compensation at the rate of $3.20 per linear foot of cable for improved areas and $2.50 per linear foot for unimproved areas.

The administrative law judge ruled that NYT was entitled to access to the Homestead development, approved its proposed method of installation, and determined that NYT should pay $1.00 as total compensation for the value of its access and installation rights. The BPU affirmed the ALJ's decision, but deleted the just compensation award pending the completion of a rule-making proceeding by the BPU to establish standards for determining just compensation in cable access cases. Defendants appealed the BPU's decision to the Appellate Division.

Defendants' third appeal is from the BPU's order in a rule-making proceeding initiated pursuant to the Chancery Division's opinion in *Princeton Cablevision, Inc. v. Union Valley Corp.*, 195 *N.J.Super.* 257 (1983). In that case the court construed § 49 of the Cable Television Act to "require" cable companies to pay compensation for access rights, and recommended that the BPU adopt rules to govern the payment of such compensation. 195 *N.J.Super.* at 270-71. The BPU held a public hearing, receiving expert testimony on various methods for calculating just compensation under § 49. Following the public hearing, the Office of Cable Television proposed a new rule, 16 *N.J.R.* 563(a) (1985), establishing the sum of $1.00 as the standard compensation to be paid by a cable company to compensate a property owner for the right of access pursuant

to § 49 of the Act. The rule permitted a property owner to apply for additional compensation, based on a "before and after" test that compared the value of the property before the cable installation with its value after the installation is completed. The rule imposed on property owners the burden of proving that the diminution in the property's value because of the cable installation exceeded $1.00. In May 1985, the BPU issued its order adopting the proposed rule. 17 *N.J.R.* 1666(a). Defendants appealed to the Appellate Division, challenging the BPU's order adopting *N.J.A.C.* 14:18-3.10.[3]

---

[3]*N.J.A.C.* 14:18-3.10 provides as follows:

(a) A cable television operator shall award $1.00 to a fee owner, as defined by N.J.S.A. 48:5A-49(b)(1), in consideration of the access granted pursuant to the Cable Television Act, N.J.S.A. 48:5A-49.

(b) Unless cable television service is being currently provided to a certain multi-family property a cable television operator shall serve written notice to the fee owner, landlord or agent of its intent to install cable television service or facilities upon the fee owner's property at least 30 days prior to commencing such installation. The Director of the Office of Cable Television has prescribed that notice be served by certified mail and that the form and content of such notice include at a minimum:

1. The name and address of the cable operator;

2. The name and address of the fee owner, manager or superintendent;

3. The approximate date of the installation;

4. Citations from the Cable Television Act and the New Jersey Administrative Code, specifically N.J.S.A. 48:5A-49 and N.J.S.A. 48:5A-51, and N.J.A.C. 14:18-3.10.

5. A general description of the proposed method of installation.

6. Notice that the amount of $1.00 in consideration for the access granted pursuant to the Cable Television Act will be tendered when an agreement is signed.

(c) If no response to the notice is forthcoming within 30 days, the cable operator has a statutory right and a franchise obligation to provide cable television service. In order to enforce this right and satisfy said obligation, a company must apply for an administrative approval for access. To apply, said company must submit to the Board of Public Utilities, copies of its notice and a specific description of the proposed method of installation.

1. If a response is received pursuant to (b) above and an agreement for access is not reached within 45 days of said response the cable operator may apply to the Director for approval to install its cable television facilities. At such time the Director will either recommend to the Board

As noted, the Appellate Division consolidated the appeals from the Chancery Division order granting access, the BPU order granting access, and the BPU order adopting *N.J.A.C.* 14:18–8.10. The Appellate Division rejected defendants' contention that *N.J.S.A.* 48:5A–49 was unconstitutional, adopting the reasoning advanced in *Princeton Cablevision, Inc. v. Union Valley Corp.*, *supra*, 195 *N.J.Super.* 257, that § 49 could be construed to require payment by a cable company for the right

that such an administrative order issue or alternatively deem such matter contested. In the event of the latter, the matter shall be handled in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B–1 et seq. and the rules of the Office of Administrative Law, N.J.A.C. 1:1–1.1 et seq.

(d) Upon notice served pursuant to (b) above, except when such notice does not apply to multi-family properties currently receiving cable television service fee owners may apply to the Office of Cable Television for just compensation. The owner has the burden of proof to clearly demonstrate:

1. The value of the applicant's property before the installation of cable television facilities;

2. The value of the applicant's property subsequent to the installation of cable television facilities;

3. The criteria, data, method or methods used to determine such values;

4. Out of pocket costs directly attributed to the installation and presence of cable television facilities in the multi-unit dwelling;

5. Any extraordinary costs to be borne by the applicant associated with the installation and presence of cable television facilities.

(e) The Director may, upon good cause shown, permit the filing of additional information to supplement the application. Copies of the application filed with the Office of Cable Television shall be served upon the cable television company in compliance with N.J.A.C. 14:17–5.1 et seq. Answers, if any, shall be filed within 20 days in compliance with N.J.A.C. 14:17–8.1 et seq. If said filing is limited to an application for compensation, the Director may permit the installation of cable television facilities provided that all issues relating to indemnification and protection of property have been satisfied.

(f) The Director shall determine whether an application filed consistent with (d) above establishes a contested case for compensation pursuant to (d). In such an event the matter shall be handled in accordance with the Administrative Procedure Act, N.J.A.C. 52:14B–1 et seq. and the rules of the Office of Administrative Law, N.J.A.C. 1:1–1.1 et seq.

(g) All executed access agreements must be filed with the Office of Cable Television pursuant to N.J.S.A. 48:5A–9(b).

of access. *NYT Cable TV v. Homestead at Mansfield, supra,* 214 *N.J.Super.* at 159–60 (citing 195 *N.J.Super.* at 270). The court also held that the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 to –50, did not apply to proceedings to determine compensation for access under the Act, reasoning that the broad authority conferred by the Act to the Office of Cable Television encompassed the incidental power to fix the compensation payable by cable companies for the exercise of their statutory right of access. *Id.* at 160–63.

The court rejected defendants' assertion that the BPU was required to balance the interests of residents desiring cable service against "the convenience, safety and well-being of other residents," concluding that the statutory right to receive cable service was unqualified. *Id.* at 163. Finally, the court upheld the BPU's just compensation regulation, dismissing challenges to the "before and after" method of valuation and to the regulation's adoption of the sum of $1.00 as a presumptive standard of just compensation. *Id.* at 163–67.

Petitioners and defendants in both the *TKR* and *NYT* cases reassert before us their contentions that *N.J.S.A.* 48:5A–49 is unconstitutional, that the BPU's access compensation regulation is invalid, and that the Eminent Domain Act provides the exclusive procedure for determining just compensation for the cable companies' exercise of access rights.

### III

#### A.

Although the nominal focus of this litigation is on the access rights of franchised cable companies, the heart of the controversy concerns competition between cable companies and SMATV operators, and is illuminated by an understanding of the technological and regulatory developments in the cable industry. Community antenna television (CATV) systems were first developed in the early 1950s in order to make network television programming available to communities otherwise un-

able to receive television signals. Hamburg, *All About Cable* §§ 1.01 to .02 at 1–1 to 1–6 (1986 rev.) (Hamburg). The basic function of CATV systems was to receive, amplify, and transmit the signals of television broadcasting stations, and distribute such signals by wire to the television receivers of their subscribers. Subscribers customarily pay an installation charge and a monthly service fee. In addition, CATV systems serve to increase the available number of television channels for the viewing public, since signals carried through cable are not subject to the same physical interference constraints that limit the availability of commercial "very high frequency" (VHF) channels. N.J. CATV Study Commission, Report to the Governor and Legislature 3—5 (1972) (CATV Report).

The growth of the CATV industry has been exponential. Nationwide, in 1952 there were seventy CATV systems with 14,000 subscribers; by 1959 there were 560 systems covering 550,000 subscribers. In 1986 there were approximately 6,000 operating cable systems serving an estimated 40,000,000 subscribers, or almost half of the nation's households owning television receivers. Hamburg, *supra*, § 1.02 at 1–7.

Cable television companies distribute their signals through coaxial cable laid under city streets or along telephone lines, subjecting them to the jurisdiction of local governments whose consent is essential to the cable companies' use of the public rights-of-way. A substantial number of states have delegated to local governments the authority to "franchise" CATV systems, while others regulate CATV at the state level. Some states, like New Jersey, divide regulatory authority between a state agency and local governments. *Id.*, § 3.01[1] at 3–5; *see infra* at 48–49. The practice of local franchising was ratified by Congress when it enacted the Cable Communications Policy Act of 1984, P.L. 98–549 § 2, 1984 U.S. Code Cong. & Ad. News (98 Stat.) 2779 (codified at 47 *U.S.C.A.* §§ 521–559 (Supp. 1987)) (Cable Act of 1984), which expressly authorizes local governments to solicit and award cable television franchises.

47 *U.S.C.A.* § 541(a)(1). See Hamburg, *supra*, § 4.02[2] at 4–6.1.

In the late 1970s, when cable franchising complications frustrated the introduction of cable systems in some areas, new technologies were developed to provide cable television service without the necessity of laying wire above or below the public street. Noam, *The "New" Local Communications: Office Networks and Private Cable*, 6 *Computer/Law Journal* 247, 270 (1985). These systems, sometimes referred to as "private cable" because they do not require access to public rights-of-way, can compete directly with franchised cable systems within a self-contained multi-unit residential complex. This technology and its future potential were explained in some detail in *N.Y. State Commission on Cable Television v. FCC:*

> The rapidly expanding cable industry has spawned a variety of methods by which cable viewing can be distributed to the public. "Traditional" or "franchise" cable systems use large remote antennas to capture television signals. The signals are distributed from the large antennas to viewers through coaxial cable laid under city streets or along telephone lines. Within the past decade, marketing innovations and advances in satellite and microwave technology have eliminated the need for the use of public rights-of-way to distribute "cable" viewing to some subscribers. Large apartment buildings and hotels can install a master antenna television (MATV) system which captures a television broadcast signal off the air and delivers it to tenants through coaxial cables that run through the buildings. In addition to improving normal television reception, MATV enables tenants to take advantage of the cable system involved in this litigation, satellite master antenna television (SMATV). SMATV transmits television signals from satellites directly to satellite receiving stations ("receive-only earth stations") atop multi-unit dwellings. The signal is converted to a usable frequency and distributed to subscribing tenants through the existing MATV system. A similar system, multi-point distribution service (MDS), beams microwave signals terrestrially to special antennas atop the buildings, and, like SMATV, uses the MATV system to distribute the signals to individual tenants. In the near future, satellite signals will be available to those who do not reside in large apartment dwellings. Direct broadcast satellite (DBS), potentially the most significant of the recent technological innovations, will provide direct satellite communication to individual homes, taking advantage of high-powered satellites and small efficient earth receiving stations. [749 *F.*2d 804, 805 (D.C.Cir.1984).]

The competitive potential of SMATV systems was substantially enhanced in 1983 when the Federal Communications Com-

mission (FCC) ruled that states were preempted from regulating the operation of SMATV systems. *IMO Earth Satellite Communications, Inc.*, 95 *F.C.C.*2d 1223, *aff'd sub nom. N.Y. State Comm'n on Cable TV v. FCC, supra,* 749 *F.*2d 804. In the *Earth Satellite* case, Suburban Cablevision, a cable television operator franchised to install its CATV system in East Orange, brought suit to enjoin Earth Satellite Communications, Inc., an SMATV operator, from installing an SMATV system in a 250–unit East Orange apartment building without approval by the Board of Public Utilities. When the Chancery Division enjoined the *SMATV* installation, *Earth Satellite* petitioned the FCC seeking an order preempting state regulatory jurisdiction. The Commission, concluding that state regulation of SMATV systems would frustrate the federal interest in the unfettered development of transmission of satellite signals, was unpersuaded by the argument that franchised cable systems would be adversely affected by federal preemption of SMATV regulation:

> We believe that state or local government entry regulation of SMATV will "chill development" of this service or impede its growth. We therefore conclude that our preemption today will ensure continued development and increased programming diversity to viewers of SMATV.
>
> We do not agree with NYSCCT that SMATV's reliance on technology similar to franchised cable should prevent us from ensuring its continued development. Nor are we persuaded by their hypothetical economic analysis of the effects on franchised cable television operations. This Commission is not an economic guarantor of competing communication technologies which may offer similar services to subscribers. Contrary to NYSCCT's assertion that preemption will stifle the development of broadband communications, we believe that this decision will encourage direct competition in a specific geographic area. * * * State or local government regulatory control over, or interference with, a federally licensed or authorized interstate communications service, intentionally or incidentally resulting in the suppression of that service in order to advance a service favored by the state, is neither consistent with the Commission's goal of developing a nationwide scheme of telecommunications nor with the Supremacy Clause of the Constitution. In addition, it would appear that in states such as New York, where franchised cable is provided access to multi-unit dwellings by state regulatory fiat, these services may co-exist, or at least have the opportunity to compete for subscribers. [95 *F.C.C.*2d at 1232–33.]

## B.

Prior to 1972 there was no statewide regulation of CATV in New Jersey. Concern over the need for "orderly development of the community antenna television industry," Preamble, Assem.Con.Res. 2041 (1971) (quoted in *CATV Report* 1), prompted the Legislature in 1971 to impose a one-year moratorium on the issuance by municipalities of CATV franchises, *L.*1971, *c.* 221, (repealed), and to create a CATV Study Commission to make recommendations for the statewide regulation of cable television. *See Assem.Con.Res.* 2041; *CATV Report* 1. In *Clear TV Cable Corp. v. Public Utility Comm'rs*, 85 *N.J.* 30 (1981), Chief Justice Wilentz described the conditions that led to the adoption of the Cable Television Act:

> Before the enactment of the New Jersey Cable Television Act in 1972, the FCC and local municipalities were the only source of regulation of the industry in this State. FCC regulation was confined to promulgating certain technical and safety standards, integrating the cable system into the over-the-air system, and encouraging cable operators to develop local and community service programming. * * * Municipalities were primarily concerned with cable's use of public rights of way, and would grant cable television franchises in return for annual fees or taxes and sometimes promises from the companies to provide community access to one or two channels. * * * As part of this municipal regulation, there were problems with cable companies "sitting on" their municipal franchises while a locality remained unserved until the area grew to a threshold pupulation. There were also allegations of municipal corruption in the granting of franchises. * * * As a result of the lack of centralized planning, cable development in New Jersey by the early 1970s had resulted in a patchwork of service across the State, with some populous communities receiving double cable service and certain rural areas, where cable service was not economically feasible, receiving no service whatsoever. [85 *N.J.* at 39 (citations omitted).]

The Cable Television Act granted regulatory authority over cable television, including rates, services, and operations to the BPU, *N.J.S.A.* 48:5A-2. It established within the BPU an Office of Cable Television, *N.J.S.A.* 48:5A-4, which was empowered to approve rates, establish technical standards of performance, adopt rules governing applications to municipalities, and generally to regulate the cable television industry. *N.J.S.A.* 48:5A-10, 11. Under the Act, cable companies desiring to operate in a particular municipality must apply for and receive

a "consent" from the municipality's governing body, *N.J.S.A.* 48:5A–22 to –25, as well as a certificate of approval from the Office of Cable Television. *N.J.S.A.* 48:5A–15 to –17. As of January 1, 1987, 525 municipalities were either receiving or in the process of obtaining cable service from a total of fifty-five CATV companies. Office of Cable Television, *Cable Facts* 23 (Jan. 1, 1987). These operations serviced at that time nearly 1.5 million subscribers, as compared with roughly 150,000 subscribers in 1972. *Id.* at 22.

## C.

The allocation of responsibility between federal and state government for regulation of cable television was fundamentally altered by the enactment of the Cable Communications Policy Act of 1984, *supra,* 47 *U.S.C.A.* § 521 to 558. In order to "assure that cable systems are responsive to the needs and interests of the local community," *id.,* § 521(2), the Cable Act of 1984 shifts the regulatory balance by limiting the jurisdiction of the FCC and emphasizing "reliance on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through the franchise process." H.R. Rep. No. 934, 98th Cong.2d Sess. 19 (1984) (House Report), *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4656. *See generally* Meyerson, *The Cable Communications Policy Act of 1984: A Balancing Act on the Coaxial Wires,* 19 *Ga.L.Rev.* 543 (1985) (reviewing Act's provisions).

Among its more significant provisions, the 1984 Act restricts local franchising authorities from regulating rates for cable service after December 29, 1986, unless the cable system is not subject to "effective competition," 47 *U.S.C.A.* § 543(b); establishes a statutory ceiling for franchise fees of five percent of gross revenues, *id.,* § 542(b); and regulates the renewal of cable television franchises in an effort to protect the cable operators against "unfair denials," while permitting local fran-

chising authorities to refuse to renew the franchise based on the operator's past performance or proposals for future service. *Id.*, §§ 521(5), 546; *see* House Report, *supra*, 25–26, 72–75, 1984 U.S.Code Cong. & Ad.News 4662–63, 4709–4712. The Act might be read as having restored the states' regulatory authority over SMATV facilities, *see* 47 *U.S.C.A.* § 541(e),[4] although a statement in the House Report disavowing any intent to overrule the FCC's decision in the *Earth Satellite* case clouds the meaning of this provision. *House Report, supra*, 63, U.S.Code Cong. & Ad.News 4700.[5] Section 541(a)(2) grants to franchised cable operators the right to use public rights-of-way and utility easements. However, the statute as enacted did not include language from the original House of Representatives version that would have granted cable operators access to multi-unit buildings unless the property owner made available equivalent sources and services. H.R. No. 4103, 98th Cong., 2nd Sess. § 633 (1984) (discussed in *House Report, supra*, 80; U.S.Code Cong. & Ad.News 4717); Myerson, *supra*, 19 *Ga.L.Rev.* at 610.[6]

---

[4]The section provides:

> Nothing in this subchapter shall be construed to affect the authority of any state to license or otherwise regulate any facility or combination of facilities which serves only subscribers in one or more multiple unit dwellings under common ownership, control, or management and which does not use any public right-of-way.

[5]One commentator has observed that the Cable Act of 1984 appears to eliminate the Federal Communications Commission's authority to pre-empt local regulation of SMATV, and suggested that ultimately "the courts must decide whether the reference in the *House Report* to the Commission's power so contradicts the plain meaning of the Act, particularly the preservation of state authority over SMATV, as to deprive the report of probative value on the interpretation of this issue." Myerson, *supra*, 19 *Ga.L.Rev.* at 609–10.

[6]In *Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI, Ltd.*, 678 *F.Supp.* 871 (D.Ga.1986), a franchised cable operator contended that the provision enacted, 47 *U.S.C.* § 541(a)(2), authorized it to install cable service in defendant's multi-unit dwellings. The District Court held that the right of access afforded by this section was limited to existing compatible easements and did not permit plaintiff to extend its cable lines beyond such easements.

## III

In this economic, regulatory, and historical context, the question before us is whether § 49 of the Cable Television Act, *N.J.S.A.* 48:5A–49, can be reconciled with the United States Supreme Court's holding in *Loretto v. Teleprompter Manhattan CATV Corp., supra,* 458 *U.S.* at 419, 102 *S.Ct.* at 3164, 73 *L.Ed.*2d at 868, that the installation of cable television wires constitutes a "taking" for which just compensation must be paid.

While the provisions of § 49 are not among the subjects debated in the public hearings conducted by the CATV Study Commission, nor mentioned in the Commission's Report to the Governor and Legislature (the proposed statute set forth as Appendix A to the CATV Study Commission's Report did not include a provision analogous to § 49; *CATV Report, supra,* Appendix A at 66–109), the incontrovertible objective of § 49 is self-evident. In pertinent part it provides as follows:

> a. No owner of any dwelling or his agent shall forbid or prevent any tenant of such dwelling from receiving cable television service, nor demand or accept payment in any form as a condition of permitting the installation of such service in the dwelling or portion thereof occupied by such tenant as his place of residence, nor shall discriminate in rental charges or otherwise against any such tenant receiving cable television service; provided, however, that such owner or his agent may require that the installation of cable television facilities conforms to all reasonable conditions necessary to protect the safety, functioning, appearance and value of the premises and the convenience, safety and well-being of other tenants; and further provided, that a cable television company installing any such facilities for the benefit of a tenant in any dwelling shall agree to indemnify the owner thereof for any damage caused by the installation, operation or removal of such facilities and for any liability which may arise out of such installation, operation or removal. [*N.J.S.A.* 48:5A–49.][7]

The statutory language plainly prohibits owners of multi-unit housing from engaging in three related activities: first, inter-

---

*Id.* at 872–75; *accord Rollins Cablevue, Inc. v. Saienni Enterprises,* 633 *F.Supp.* 1315, 1320–22 (D.Del.1986).

[7]Section 49 has been amended by the Legislature to expand the definition of "owner" to include a mobile home park owner or operator, *L.*1982, *c.* 231, and a condominium association or housing cooperative. *L.*1983, *c.* 166.

fering with any tenant's right to receive cable television service; second, demanding or accepting payment from anyone to permit installation of cable service in the *dwelling or in the unit* occupied by a tenant; and third, discriminating against a tenant who receives cable television service. In my view, the meaning of § 49, and the Legislature's objective in enacting it, could not be clearer. Franchised companies were to have unrestricted access to multi-unit dwellings, and owners could not demand or receive payment from the cable companies, or from tenants, as a condition of granting such access. Section 49 gives the owner but one power: to assure that the installation of cable service is performed safely and to require the cable company to indemnify the owner for damage caused in the course of installation.

Accordingly, I disagree with the conclusion reached in the concurring opinion that § 49 "can be viewed as being neutral toward the issue of compensation" and that its language can be said "neither to prohibit nor require the payment of just compensation." *Ante* at 26. There is nothing "neutral" about § 49. It bars owners from accepting "payment in any form" for permitting installation of cable service in the dwelling. *N.J.S.A.* 48:5A–49. To read § 49 as requiring, not prohibiting, the payment of compensation by the cable company to the owner is an act of judicial legerdemain.

I also disagree with the interpretation of § 49 adopted by the Chancery Division in *Princeton Cablevision, Inc. v. Union Valley Corp., supra,* 195 *N.J.Super.* 257, and on which the Appellate Division relied in the *NYT Cable TV* case, *supra,* 214 *N.J.Super.* at 159–60. In *Princeton Cablevision,* the court acknowledged that § 49 was invalid if it authorized a taking without just compensation, 195 *N.J.Super.* at 269, but observed that the court's duty was to "uphold the validity of a statutory provision if invalidation can be avoided," and that "if it is necessary to engage in 'judicial surgery' to save an ailing enactment, and if it appears that the legislature would have wanted the statute to survive, it is the court's duty to operate." *Id.* at 270. The court concluded that an obligation to pay

compensation for the taking could be extracted from § 49's requirement that the cable company "indemnify the owner * * * for any damage caused by the installation, operation or removal of [cable] facilities." *Ibid.* It reasoned that "[a] generous reading of those words would include an obligation to pay damages for the taking of the owner's property. Such a reading is necessary to save § 49 from invalidation and will therefore be made." *Ibid.* at 270.

I differ with the Chancery Division in two respects. First, I view the court's interpretation as *contradictory* to the plain meaning of § 49, and therefore beyond the permissible scope of construction for the purpose of saving an otherwise invalid statute. *Cf. New Jersey Bd. of Higher Educ. v. Shelton College,* 90 *N.J.* 470, 478 (1982) (court can devise saving interpretation only if "statute is 'reasonably susceptible' of such construction"). Section 49 prohibits the payment by cable companies for access to multi-unit dwellings. Their obligation to compensate an owner for damage that occurs during installation cannot fairly be expanded to include an obligation to pay what the statute forbids—compensation for the right of access.

Secondly, I do not share the Chancery Division's assurance that "the legislature would have wanted the statute to survive," 195 *N.J.Super.* at 270, a predicate to the Chancery Division's initiative to attempt to uphold the statute. It is clear that SMATV technology was not a factor when § 49 was enacted; nor is there any indication that its existence was considered on the two occasions that § 49 was amended. *See supra* at 51 n. 7. The present availability of SMATV service in multi-unit dwellings may persuade the Legislature that mandatory access by cable companies to such dwellings is no longer necessary, or that such access should depend on the preference of the residents, who may or may not be satisfied with the

service provided by SMATV.[8]  On the other hand, the Legislature may conclude that licensed cable companies should continue to have access to multi-unit dwellings, whether or not such dwellings receive cable programming from another source.

I intimate no view whatsoever on the policy choice to be made by the Legislature, but conclude that section 49's unlimited grant of free access by cable companies to multi-unit dwellings was established in the context of different regulatory, competitive, and technological conditions.  Accordingly, I cannot be satisfied that the judiciary would be furthering the Legislature's present objectives if it construed § 49 to preserve the cable companies' original right of unlimited access, subject to the payment of just compensation, in today's economic and regulatory climate.  *See Callen v. Sherman's*, 92 *N.J.* 114, 134 (1983) (court should "engage in judicial surgery" only if Legislature would want statute to survive); *New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n*, 82 *N.J.* 57, 75 (1980) (same).

My concurring colleague agrees that an essential predicate to "judicial surgery" is the determination that the Legislature "would have wanted the statute to survive as modified," *ante* at 27–28, but infers, primarily on the basis of the amendments to § 49, a "legislative desire to preserve and continue its regulatory scheme." *Ante* at 31.  In my view, that "inference" as to the Legislature's presumed desire does not suffice as the foundation for the quantum leap required to sustain this statute.  Unless the Court is secure in its view that "saving" the statute comports with the Legislature's intent, the appropriate

---

[8]A Florida statute appears to limit the right of access by cable companies where comparable private cable television services have been made available to a multi-unit dwelling.  *See Fla.Stat.Ann.* § 83.66(4) (1984).  Statutes in Connecticut and New York prevent a cable company from committing any act that would "diminish or interfere" with the right of a multi-unit dwelling occupant to use or avail himself of "master or individual antenna equipment." *Conn.Gen.Stat.* § 16–333(d) (1987); *N.Y.Exec.Law* § 828(3) (McKinney 1983).

course is to take the statute as we find it and allow the Legislature to remedy its constitutional defects as it chooses.

The Supreme Court of Florida in *Storer Cable TV v. Summerwinds Apartments Ass'n*, 493 *So*.2d 417 (1986), construing a statutory provision similar to § 49, reached the same conclusion. There, the court held that to "construe [the statute] as authorizing a taking and requiring payment of just compensation * * * would be contrary to the clear intent of the legislature. Section 83.66(1), in unambiguous language, directs that no compensation be paid." *Id.* at 419; *see also* Note, *The Connecticut Mandatory Cable Access Statute: Ripe for Review*, 7 *Bridgeport L.Rev.* 329, 346–59 (1986) (analyzing decisions and concluding that Connecticut mandatory access statute is unconstitutional).[9]

In view of my conclusion that § 49 permits a "taking" of property without just compensation and is therefore invalid under *Loretto v. Teleprompter Manhattan CATV Corp., supra*, 458 *U.S.* 419, 102 *S.Ct.* 3164, 73 *L.Ed.*2d 868, I do not address petitioners' and defendants' other contentions concerning the exclusivity of the Eminent Domain Act for determining just compensation, or the validity of the BPU's access regulation, *N.J.A.C.* 14:18–3.10. I note, however, that on remand from the Supreme Court the New York Court of Appeals persuasively rejected a similar argument concerning the exclusivity of New York's eminent domain statute for determining just compensation for access by cable companies. *Loretto v.*

---

[9]Nor is the decision by the New York Court of Appeals in *Loretto v. Teleprompter Manhattan CATV Corp.*, 58 *N.Y.*2d 143, 459 *N.Y.S.*2d 743, 446 *N.E.*2d 428 (1983), on remand from the United States Supreme Court, inconsistent with our conclusion. As the New York Court of Appeals pointed out, that state's access statute, *N.Y.Exec.Law* § 828(1)(b) (McKinney Supp.1981–1982), "expressly empowers the commission to determine the reasonable amount to be paid by a cable television company to a property owner in exchange for permitting cable television service on his property." *Id.* 459 N.Y.S.2d at 747, 446 *N.E.*2d at 432. No comparable provision authorizing the BPU or the Office of Cable Television to fix compensation in exchange for access appears in § 49.

*Teleprompter Manhattan CATV Corp.*, 58 *N.Y.*2d 143, 459 *N.Y.S.*2d 743, 748, 446 *N.E.*2d 428, 433 (1983).

For the reasons stated, I would reverse the judgments of the Appellate Division.

HANDLER, O'HERN and GARIBALDI, JJ., concurring in the result.

*For affirmance* —Justices HANDLER, O'HERN and GARIBALDI—3.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD and STEIN—3.